Brad S. Daniels, OSB No. 025178
brad.daniels@stoel.com
Nathan R. Morales, OSB No. 145763
nathan.morales@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone:  503-294-9496
Facsimile:  503-220-2480

      Attorneys for Plaintiff


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON ASSOCIATION OF HOSPITALS AND HEALTH SYSTEMS, | Case No. 3:22-cv-01486-SI |
|       Plaintiff, | |
| v. | FIRST AMENDED COMPLAINT[1] |
| STATE OF OREGON; OREGON HEALTH AUTHORITY; and PATRICK ALLEN, in his official capacity as Director of Oregon Health Authority, | |
|       Defendants. | |

Oregon Association of Hospitals and Health Systems ("Plaintiff" or "OAHHS") hereby

brings this Complaint against the State of Oregon ("State"), Oregon Health Authority ("OHA"),

and Patrick Allen ("Allen"), in his official capacity as Director of OHA, and alleges as follows:

---

[1] Pursuant to Federal Rule of Civil Procedure 15(a)(2), Defendants have provided their written consent to the filing of this amended pleading.

Page 1   -  FIRST AMENDED COMPLAINT

## I.  INTRODUCTION

1.      For over a century, Oregon hospitals and health systems have cared for their local

communities.  They have pursued innovative transactions designed to increase patient access to

care, establish new services to meet changing patient needs, serve patients in rural and

historically marginalized communities, and manage health care costs, all for the benefit of

Oregonians living in every region of the State.  Although the State has regulated certain aspects

of health care, it has historically allowed hospitals, clinics, and health care providers to meet the

needs of their patients and local communities—from rural to urban—without undue government

interference.  That approach has ended.  In its place, the Oregon legislature has created a regime

in violation of the United States Constitution and the Oregon Constitution.

2.      On July 27, 2021, the Governor signed House Bill 2362 (2021) ("HB 2362") into

law.  *See* Or. Laws 2021, ch. 615.[2]  *See* Appendix A.  HB 2362 is not simply a policy choice

about regulating the health care market.  It does not merely authorize OHA to fill in the gaps of a

statute that otherwise provides clear direction to the agency that enforces it and the parties who

are subject to its requirements.  And it is not a licensing regime that empowers an agency to

regulate health care providers based on objective criteria related to patient safety, scope of

practice, or financial stability.

3.      Instead, HB 2362 gives OHA the unprecedented authority to approve, deny, and

dictate the terms of a broad array of transactions and relationships involving "health care

entities."  In doing so, the law fails to establish the standards or criteria that OHA must use to

either identify or evaluate such transactions.  HB 2362 erects barriers to exactly the types of

---

[2] HB 2362 is codified at Oregon Revised Statutes §§ 415.500 – 415.900.  For ease of reference, OAHHS will refer to the law in narrative form as HB 2362, but will cite directly to the relevant sections of the Oregon Revised Statutes.

collaborative partnerships and arrangements that local hospitals and clinics have historically pursued to increase access to quality care. Furthermore, HB 2362 threatens to deter or delay transactions that would benefit Oregon communities, will result in unnecessary interventions and micromanagement by OHA, and will add costs to our already strained health care system.

4.      At its core, the Due Process Clause of the Fourteenth Amendment requires that a law must give persons fair notice of what it prohibits, and not be so vague that it authorizes random or discriminatory enforcement. HB 2362 fails that requirement. It prohibits conduct and imposes penalties for non-compliance, but establishes no standards for what conduct is prohibited or when those penalties are triggered. Consequently, HB 2362 violates the Due Process Clause.

5.      For similar reasons, HB 2362 also violates a basic principle of the Oregon Constitution: the nondelegation doctrine. Article III, section 1, and related provisions, of the Oregon Constitution prevent the legislature from delegating legislative authority to executive agencies. In short, to preserve the constitutional separation of powers, the legislature cannot give agencies the power to make law. HB 2362, however, does exactly that. In a major sector of Oregon's economy that affects every Oregonian, HB 2362 leaves it entirely up to OHA to choose the entities subject to the law, the types of health care transactions subject to review, and the criteria OHA will use to approve, deny, or dictate conditions on such transactions.

6.      OAHHS, therefore, brings this case to vindicate its rights and the rights of its members (and through them, their patients, caregivers, and communities), to have this Court declare HB 2362 unconstitutional and prospectively enjoin its continued administration.

## II. PARTIES

7.      Plaintiff OAHHS is a statewide nonprofit trade association representing Oregon

hospitals and health systems.  In 1934, a number of Oregon's hospitals and health systems

formed OAHHS to work closely with local and national government leaders, businesses,

community coalitions, and other professional health care organizations; to enhance and promote

community health; and to continue improving Oregon's innovative health care community.

OAHHS's members include hospitals and health systems throughout Oregon.  OAHHS supports

hospitals so that hospitals can support their communities.

8.      OAHHS's members include many of Oregon's hospitals and health systems that

are subject to the requirements of HB 2362.  OAHHS's members have engaged in and will

engage in a range of transactions—including contracts, affiliations, partnerships, and ventures—

designed to maintain or grow access to health care and serve their communities.  Many of those

transactions would have and will likely trigger the requirements of HB 2362 (though, as

explained further below, the scope and nature of the law's requirements are unconstitutionally

vague).

9.      OAHHS's Mission Statement is to "[p]rovide leadership in health policy through

analysis, advocacy and member engagement to strengthen Oregon hospitals and health systems,

deliver quality care and best serve our communities."  OAHHS spends its own resources to effect

that mission.  Prior to, during, and after the enactment of HB 2362, OAHHS diverted its

resources to address the unconstitutional policies and practices included in HB 2362.  But for

those unconstitutional policies and practices, OAHHS would have spent its resources elsewhere.

10.      As noted, a core component of OAHHS's Mission Statement is "to strengthen

Oregon hospitals and health systems, deliver quality care and best serve our communities."

HB 2362, however, weakens Oregon's hospitals and health systems by deterring innovation, increasing risk and cost, and reducing their ability to provide quality health care and serve our communities, thus frustrating OAHHS's mission.

11.     OAHHS is bringing this action directly on behalf of itself and in a representational capacity on behalf of its members.  OAHHS is authorized to bring this action because the legality of HB 2362 is directly linked and germane to OAHHS's purpose and mission.  Because this action concerns only the legality of HB 2362, OAHHS's claims for relief do not require the participation of its individual members.

12.     This is an action only for prospective injunctive and declaratory relief against Defendants the State, OHA, and Allen in his official capacity as current Director of OHA.  OHA and Allen constitute the political subdivisions of the State responsible for administering and enforcing HB 2362.  Defendant Allen's official administration and enforcement of HB 2362 has resulted in a continuous constitutional violation, which OAHHS now seeks to remedy.

## III.  JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over OAHHS's First Claim for Relief pursuant to 28 U.S.C. § 1331, because that claim arises under the United States Constitution. The Court has supplemental jurisdiction over OAHHS's Second Claim for Relief pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in the United States District Court, District of Oregon, Portland Division, because the events giving rise to OAHHS's claims took place within this district.

Page 5   -   FIRST AMENDED COMPLAINT

## IV.  FACTUAL BACKGROUND

**A.**    **Oregon's Hospitals and Health Systems**

15.    Oregon's hospitals began in the late 1800s and achieved their current success through the ability to freely associate and contract with other hospitals, providers, and clinics. Oregon has more than 60 hospitals.  Of those, more than 30 are rural hospitals.  Or. Rev. Stat. § 442.470(6)(a).  Fifty-eight of the hospitals in Oregon are not-for-profit.  Hospitals are more than just buildings; they are cornerstones within the communities they serve.  In addition to providing direct, acute patient care on a daily basis, Oregon hospitals have employed hundreds of thousands of Oregonians, advanced community care, and provided services to generation after generation of Oregonians.  Over the years, Oregon hospitals have engaged in many transactions with other health care entities to increase health care innovations in Oregon through expanded access and increased technologies, and to fulfill their respective missions.

16.    OAHHS's members provide access to high-quality care for people in Oregon.  In the past, OAHHS's members have recognized significant cost savings by being able to associate with other hospitals and health care networks.  Nearly every OAHHS member has, at some point, taken actions that now could trigger the requirements under HB 2362.

**B.**    **Health Care-Related Collaborations and Partnerships**

17.    Through separate and preexisting statutes (not HB 2362), the change of control of an Oregon hospital is already subject to review and approval by OHA (Oregon's licensing body for health care facilities) and, in the case of a hospital operated by a charitable entity, the Oregon Department of Justice.  *See* Or. Rev. Stat. § 65.800, *et seq*; Or. Rev. Stat. § 441.025.  In addition, under another law that is separate and distinct from HB 2362, OHA must issue a certificate of

need prior to the creation of, or expansion of services at, an Oregon hospital.  Or. Rev. Stat.
§ 442.310, *et seq*.

18.    The regulatory regime existing prior to HB 2362 allowed Oregon to maintain a
vibrant ecosystem of hospitals and health systems that could innovate, collaborate, partner, and
expand without undue government interference to respond to the changing needs of Oregon's
patients and providers.

19.    Health care transactions proceeded with an appropriate level of government
review.  The proponents of HB 2362, however, believed that Oregon needed a new and
unprecedented regulatory regime that would allow government micromanagement of the health
care marketplace—a large and critically important piece of the state's economy that is vital to the
health of everyone in Oregon.

20.    HB 2362 imposes significant increased costs on OAHHS's members and other
health care entities through unchecked oversight and cost-shifting related to the transactions that
OHA chooses to review.

21.    HB 2362 deters innovations that OAHHS's members have pursued and will
pursue.  It also adds market uncertainty and increased cost to transactions that OAHHS's
members will pursue.

22.    HB 2362 has had these effects and will continue to have these effects, because it
creates an unprecedented and unchecked regime that will prevent Oregon's hospitals and health
systems from engaging in collaborative relationships, unless they first obtain costly review and
approval from OHA, based on some unspecified legislative criteria and agency guidance that can
change at will.  Even if transactions are approved, they may be subject to conditions imposed by
OHA that make the transaction infeasible.

Page 7    -    FIRST AMENDED COMPLAINT

**C.      The Enactment of HB 2362**

23.      In 2021, some Oregon legislators and others questioned whether the State should further regulate health-care-related transactions.  Shortly thereafter, HB 2362 was introduced in the Oregon legislature.

24.      HB 2362 first was referred to the Oregon House of Representatives on January 1, 2021, during the 81st Oregon Legislative Assembly's regular session.  On June 25, 2021, the bill passed in the House and was referred to the Senate.  The Senate voted to pass HB 2362 the next day, on June 26, and the Governor signed it on July 27.

25.      The bill on its face appears somewhat similar to other laws governing health care transactions in Oregon.  Unlike the authority under those existing laws, however, HB 2362 is not focused on long-standing legal principles related to blocking monopolies, preventing private inurement, or ensuring that licensees adhere to applicable licensing standards.

26.      Instead, HB 2362 provides OHA with new and boundless authority to deny or dictate conditions on a wide array of health care transactions without any statutory limits on either the criteria that OHA may use to review transactions, or the types of conditions it may place on such transactions.

27.      The law allows OHA's appointees to conduct the initial factfinding and create the official factual record, which OHA relies on to determine whether a proposed health care transaction should proceed.  There is also unchecked ability of those appointees to shift the cost of such factfinding, including through the use of outside experts, to health care entities.  The law does not, however, inform regulated entities how, why, or how much, they might actually have to spend to comply with HB 2362.

28.    HB 2362 establishes a regime not found in any other state.  Through HB 2362, the Oregon legislature has unconstitutionally delegated to an administrative agency (with the factfinding assistance of a potentially conflicted "community review" board of OHA appointees) its own obligation to legislatively (a) define what "health care entities" will potentially be subject to the law's requirements; (b) define which "material change transactions" are subject to review and approval; and (c) establish the criteria by which OHA will approve, deny, or dictate changes to such transactions, including those involving OAHHS's members.

29.    The text of HB 2362 makes it clear that the legislature's intent was not cost control or anti-monopolization.  HB 2362 is titled the "Equal Access to Care Act," and its proponents drafted the language so broadly that the agency is given no criteria by which to determine when to deny or restrict transactions.  That approach ensures that OHA and the OHA-constituted "community review" board of OHA's appointees may deny or dictate conditions on a proposed transaction for any reason, without proper notice to OAHHS and its members.

30.    OAHHS and its members participated in the legislative process to, among other things, identify various legal issues with the proposed bill, but were drowned out by the louder voices at the table.  Among many issues, OAHHS and its members expressly pointed out that HB 2362 did not provide OHA or Oregon's hospitals with clear and objective standards for identifying and reviewing transactions under the new law.  Despite those valid protestations, HB 2362 passed with 32 votes in the House and 16 in the Senate, and was signed by the Governor.  *See* Or. Laws 2021, ch. 615.

**D.    Provisions of HB 2362**

31.    HB 2362 provides OHA with virtually limitless authority to deny, approve, or approve with conditions a wide array of health care-related relationships (including contracts),

115453394.46 0076593-00001

partnerships, and transactions.  The law imposes four primary requirements on any "health care

entity" that wishes to engage in a "material change transaction":  (1) notice, (2) preliminary

review, (3) comprehensive review, and (4) fees and penalties.

32.    With respect to notice, HB 2362 requires any "health care entity" to provide OHA

not less than 180 days' advanced notice of any "material change transaction."  Or. Rev. Stat.

§ 415.501(3), (4).  Although the statute includes definitions for both "health care entity" and

"material change transaction," those definitions are so broad and ambiguous that it is impossible

from the text of the law to determine the scope of its requirements and prohibitions.

33.    Specifically, the legislature's definition of the term "health care entity" includes a

non-exclusive list of persons and entities—all licensed or certified individual health

professionals, hospitals and hospital systems, coordinated care organizations, and other specified

payors.  Critically, however, the definition is not limited to those entities.  It also includes any

"other entity that has as a primary function the provision of health care items or services or that

is a parent organization of, or is *an entity closely related to*, an entity that has as a *primary

function* the provision of *health care items or services*."  Or. Rev. Stat. § 415.500(4)(a)(F)

(emphasis added).  Because it left key terms such as "health care items or services," "primary

function," and "closely related to" undefined, the legislature failed to answer a critical question:

To whom does this law apply?

34.    Moreover, the law vaguely defines "transaction" as any (a) merger of a health

care entity with another health care entity, (b) acquisition of one or more health care entities by

another entity, (c) *new contract*, clinical affiliation, or *contracting affiliation* "that will eliminate

or significantly reduce, as defined by the authority by rule, essential services," (d) "corporate

affiliations" involving at least one health care entity; or (e) transactions to form a new

115453394.46 0076593-00001

partnership, joint venture, accountable care organization, parent organization, or management

services organization, as prescribed by the authority by rule.  Or. Rev. Stat. § 415.500(10).  The

legislature delegates to OHA and other bodies the authority to define most of the operative terms

of this definition, including "corporate affiliation," "eliminate or significantly reduce . . .

essential services," and transactions creating a new entity.  Thus, the agencies themselves, not

the legislature, are determining, on an *ad hoc* basis, both who is covered by the statute and what

transactions are regulated.[3]

      35.     Concerning preliminary review, the legislature delegated to OHA (after receiving

the required notice from the parties) the authority to conduct a preliminary review of a proposed

"material change transaction."  The preliminary review is "to determine if the transaction has the

potential to have a negative impact on access to affordable health care in this state ***and*** meets the

criteria in subsection (9) of this section."  Or. Rev. Stat. § 415.501(5) (emphasis added).  As

outlined below, the criteria in subsection (9) include whatever criteria OHA determines by rule.

---

[3] The definition of "material change transaction" also includes, *inter alia*, a revenue threshold:

> "Material change transaction" means:
>
> (A)  A transaction in which at least one party had average revenue of $25 million or more in the preceding three fiscal years and another party:
>
> > (i)  Had an average revenue of at least $10 million in the preceding three fiscal years; or
> >
> > (ii)  In the case of a new entity, is projected to have at least $10 million in revenue in the first full year of operation at normal levels of utilization or operation as prescribed by the authority by rule.

Or. Rev. Stat. § 415.500(6)(a).

115453394.46 0076593-00001

36.    The legislature outlined criteria when transactions, following a preliminary review, "shall" be approved or approved with conditions.  Those criteria include, but are not limited to:

> (a) If the transaction is in the interest of consumers and is urgently necessary to maintain the solvency of an entity involved in the transaction; or
>
> (b) If the authority determines that the transaction does not have the potential to have a negative impact on access to affordable health care in this state or the transaction is likely to meet the criteria in subsection (9) of this section.

Or. Rev. Stat. § 415.501(6)(a)-(b).

37.    If a transaction fails to meet whatever standards OHA may establish for preliminary approval, then OHA conducts a "comprehensive review."  Or. Rev. Stat. § 415.501(7).

38.    At the comprehensive review stage, the legislature delegated to OHA complete and unlimited power for determining how to review a proposed transaction, and for determining whether the proposed transaction would be approved.  Exemplifying HB 2362's circularity, the criteria for approval are:

- The transaction will "benefit the public good and communities" by reducing the growth in patient costs in accordance with another law or maintaining a rate of cost growth that exceeds the target that the entity demonstrates is in the "best interest" of the public, increasing access to services in medically underserved areas, or rectifying historical and contemporary factors that contribute to a lack of health equities or access to services, or will improve health outcomes for residents of this state; *and*

Page 12  -   FIRST AMENDED COMPLAINT

- That there is no substantial likelihood of anticompetitive effects that outweigh the benefits of the transaction in increasing or maintaining services to underserved populations; *and*

- OHA "*determines that the transaction meets the criteria adopted by the department by rule*" under subsection (2).  Or. Rev. Stat. § 415.501(9) (emphasis added).

39.    The end result of that textual mishmash of cross-references is that OHA has unlimited ability to set the standard for approval, approval with conditions, or denial.  In fact, OHA may establish any criteria it wishes, with no limit or standard from the legislature as to what its rules must contain.  Even if the transaction satisfies *all* of the conditions that the *legislature* has established for comprehensive approval, if OHA does not determine that the transaction meets *its* criteria (whatever those may be), the transaction will fail.

40.    At the comprehensive review stage, the legislature also empowered OHA to "appoint a review board of stakeholders to conduct a comprehensive review" of the proposed transaction.  Or. Rev. Stat. § 415.501(7).  For this comprehensive review, the "community review" board of OHA's appointees engages in factfinding concerning the proposed transaction, and then OHA may approve the transaction only if it "determines that the transaction meets the criteria adopted by the department by rule" based on the board's factfinding.  The law does not, however, provide OHA (or the board of its appointees) with any guidance or standards for adopting the "criteria."  It also does not include any true conflict-of-interest provisions applicable to the new board of OHA's handpicked appointees.[4]

---

[4] HB 2362 provides only that "[a] member of a review board shall file a notice of conflict of interest and the notice shall be made public."  Or. Rev. Stat. § 415.501(11)(b).  Unlike the provision applicable to OHA's officers and employees, however, it does not identify what

41.     At both the preliminary and comprehensive review stages, OHA has the authority to impose "conditions" on its approval.  HB 2362 does not specify what conditions may be imposed, however, nor does it specify any criteria or limits regarding those conditions.  As a result, in an effort to understand and implement the statute's vague and broad requirements, OHA may impose conditions that make the transaction impossible or infeasible.

42.     And finally, in regard to the fees and penalties, HB 2362 authorizes OHA to collect a "fee" that is "proportionate to the size of the parties to the transaction, sufficient to reimburse the costs of administering" HB 2362.  Or. Rev. Stat. § 415.512.  Those "fees" are deposited to the Oregon Health Authority Fund.  Additionally, OHA may seek injunctive relief and "may impose a civil penalty, as determined by the director, for a violation of" HB 2362, including the notice requirement.  *Id.* §§ 415.501(22), 415.900.  OHA also may retain experts to assist with the transaction review, and "designate the party or parties . . . that shall bear the reasonable and actual cost of retaining the professionals."  *Id.* § 415.501(14).

43.     Those provisions effectively give OHA a blank check to impose costs on Oregon hospitals and health care providers for any amount, without providing Oregon's hospitals sufficient notice concerning the calculation of those costs, the amount of those costs, or their relationship to the transaction.[5]

---

constitutes a conflict of interest requiring notice and how any such conflict should be resolved. *Cf. id.* § 415.505 (providing that, for an "officer or employee of" OHA, it is a conflict of interest to, for example, be financially interested in a party to a proposed transaction under HB 2362).

[5] In rules effective January 1, 2023, OHA has established a scale of comprehensive review fees, Or. Admin. R. 409-070-0030(3), but, as with other provisions of the statute, OHA's attempt to supply administrative criteria does not substitute for legislative action.

Page 14   -   FIRST AMENDED COMPLAINT

E.    **Results of HB 2362's Unconstitutional Vagueness and the Legislature's Unconstitutional Delegation**

44.    Because the legislature has failed to provide OHA with sufficient legislative guidance on how to administer HB 2362, OHA has attempted to create its own criteria and standards, which only have created more confusion and lack of fair notice.  Indeed, even between the filing of the Complaint and this First Amended Complaint, OHA continues to update and change guidance documents and rules.  The result is a shifting regulatory landscape caused by HB 2362's impossibly vague, and unconstitutionally broad, delegation of authority.

1.    **Determining What Constitutes a "Material Change Transaction"**

45.    Under HB 2362, a regulated entity must notify OHA of a "material change transaction" or be subject to civil penalties.  For a transaction subject to the notice requirement, the review and approval requirements of HB 2362 also apply.

46.    HB 2362 provides that a "material change transaction" includes any new contract, new clinical affiliation, or new contracting affiliation that will "***eliminate or significantly reduce***, as defined by the authority by rule, essential services."  Or. Rev. Stat. § 415.500(10)(c) (emphasis added).

47.    The law does not, however, define the phrase "eliminate or significantly reduce," so it is impossible for OAHHS's members to determine when that condition has been or might be triggered.  Instead, OHA has issued rules and multiple purported "sub-regulatory guidance documents."

48.    Although HB 2362 defined the phrase "essential services," that definition simply refers to a separate statutory term, by defining those services as ones (a) funded on the prioritized

Page 15   -   FIRST AMENDED COMPLAINT

list of services created by the Health Evidence Review Commission pursuant to ORS 414.690[6]

and (b) "[s]ervices that are *essential* to achieve *health equity*."  Or. Rev. Stat.

§ 415.500(2) (emphasis added).  It is impossible from the text of the law to determine what

"health equity" means and what is "essential" to achieve it.  For example, in rule changes

effective January 1, 2023, OHA defines "[s]ervices that are essential to achieve health equity,"

but that definition is not tied to any legislative text, and it is entirely unclear how the agency

could determine that its definition was or was not consistent with HB 2362.  Or. Admin. R. 409-

070-0005(28).

49.    HB 2362 does not define "health equity."  Instead, the law provides that the

statutory definition of "health equity" is whatever OHA and the Oregon Health Policy Board

determine that phrase means.  *See* Or. Rev. Stat. § 415.500(5) ("'Health equity' has the meaning

prescribed by the Oregon Health Policy Board and adopted by the authority by rule.").

50.    In the rules effective January 1, 2023, OHA broadly defined "health equity" by

rule as "a health system having and offering infrastructure, facilities, services, geographic

coverage, affordability and all other relevant features, conditions and capabilities that will

provide all people with the opportunity and reasonable expectation that they can reach their full

health potential and well-being and are not disadvantaged by their race, ethnicity, language,

disability, age, gender, gender identity, sexual orientation, social class, intersections among these

communities or identities, or their socially determined circumstances."  Or. Admin. R. 409-070-

0005(17).  OAHHS supports health equity.  The concern is that the definitions in this law and

rule do not notify parties of the standard or criteria by which a transaction will be assessed.

---

[6] The Health Evidence Review Commission is a 13-person body appointed by the governor and confirmed by the Senate.  It develops a prioritized list of health services that the legislature uses to guide funding decisions for Oregon's Medicaid program (the Oregon Health Plan).

51.    For example, to determine whether they are about to enter into a "material change transaction," which requires notice to and review by OHA, an entity must determine whether it is a "health care entity."  Then it must guess whether the potential new contract or affiliation will "eliminate or significantly reduce" any services, without legislative guidance on what that means.  Then, if the answer to that question is yes, it next must undertake the impossible task of determining whether those are "essential services," by trying to figure out whether any services being significantly reduced somehow are "essential to achieve" a health system "having and offering infrastructure, facilities, services, geographic coverage, affordability and all other relevant features, conditions and capabilities that will provide all people with the opportunity and reasonable expectation that they can reach their full health potential and well-being and are not disadvantaged by their race, ethnicity, language, disability, age, gender, gender identity, sexual orientation, social class, intersections among these communities or identities, or their socially determined circumstances."

52.    That vagueness arises in other circumstances.  HB 2362 defines "transactions" to include "[t]ransactions to form a new partnership, joint venture, accountable care organization, parent organization or management services organization, as prescribed by the authority by rule."  Or. Rev. Stat. § 415.500(10)(e).  Although the legislature did not write "[e]liminate or significantly reduce services" into this portion of the law, OHA wrote it into the rule.  Or. Admin. R. 409-070-0010(1)(e)(A).

**2.    How OHA has Attempted to Define "Essential Services" and "Significantly Reduce," Without the Legislature's Guidance**

53.    Because the legislature did not provide any guidance on how to define "essential services" and "significantly reduce," OHA unilaterally has attempted to resolve the ambiguities.  For example, OHA's sub-regulatory documents include, among others, hypothetical examples

that exemplify the types of scenarios OHA would consider to constitute a transaction that

"significantly reduces" what it believes are "essential services."  Oregon Health Authority,

*Defining Essential Services & Significant Reduction* (Jan. 31, 2022), HCMO-Essential-Services-

and-Significant-Reduction-Guidance-FINAL.pdf (oregon.gov).

54.    For example, one of the documents references a hypothetical "contracting

affiliation," whereby an existing hospital and clinic want to enter into a relationship, allowing

some existing clinic doctors to move to see patients on the hospital's campus.  In that example,

OHA concludes that the services being provided in this hypothetical are "essential."

55.    OHA then analyzes eight criteria to determine whether the transaction will result

in a reduction of essential services that is "significant."  There is no indication of where or how

OHA came up with those criteria, but it considers them regardless.

56.    After viewing the hypothetical facts through the lens of its newly created criteria,

OHA concludes that the transactions would have numerous and clear benefits:

(i) There would be no reduction of providers;

(ii) There would be no reduction of providers serving new patients and individuals who

are uninsured and underinsured;

(iii) There would be no restrictions regarding rendering, discussing, or referring to any

essential services;

(iv) There would be no decrease in the availability of essential services;

(v) There would be no increase in appointment wait times;

(vi) There would be no increase in any barriers for community member seeking care,

such as prior authorizations or required consultations before receiving essential services;

and

Page 18   -   FIRST AMENDED COMPLAINT

(vii) There would be no reduction of a specific type of care.

57.     Despite those findings of no adverse patient impacts, OHA then concludes that the hypothetical affiliation actually would result in a "significant reduction" of essential services, making it subject to the extensive and costly review under HB 2362.  The only basis for that counterintuitive result cited by OHA is an increase of five miles in the median distance traveled by patients to the new hospital location, from 10 to 15 miles.  OHA concludes this is greater than an increase in time and distance of one-third, and therefore it is "significant."

58.     The median distance metric and the one-third standard (and many of the other criteria used by OHA to decide that this hypothetical transaction is subject to review and approval) are nowhere to be found in HB 2362.

59.      In rules to be effective January 1, 2023, OHA has included some concepts from the sub-regulatory guidance documents, including its invented criteria that a "significant reduction in services" occurs when a transaction will result in a change of one-third or more of, *inter alia*, increase of time or distance, providers, or availability of essential services. Or. Admin. R. 409-070-0010(3).  Whether those criteria are in sub-regulatory guidance or rules, however, the point is the same:  OHA is developing binding, legislative criteria on its own without any limits or guardrails in the enabling statute.

60.     OHA's own example illustrates (1) the complete lack of defining criteria with respect to critical aspects of HB 2362's applicability and (2) the legislature's decision to give OHA complete authority to arbitrarily determine the scope of HB 2362.  The result will be lack of fair notice and arbitrary enforcement and definitions, such as those illustrated above, which are wholly untethered to any actual legislative standards or criteria.

Page 19   -   FIRST AMENDED COMPLAINT

3.    **The Criteria OHA Applies When Reviewing and Approving (or Denying) a Proposed "Material Change Transaction"**

61.    Once OHA and regulated entities finally determine whether something is a "material change transaction," HB 2362 requires that OHA review the transaction "based on criteria prescribed by the authority by rule."  Thus, the new law delegates the authority to develop the criteria and procedures used for OHA's evaluation of a "material change transaction" to OHA and the Oregon Health Policy Board.  *See* Or. Rev. Stat. § 415.501(2) ("Oregon Health Authority shall adopt by rule criteria approved by the Oregon Health Policy Board for the consideration of requests by health care entities to engage in a material change transaction and procedures for the review of material change transactions under this section.").

62.    Because the legislature did not provide OHA with any standards or criteria to govern its review under HB 2362, OHA has promulgated its own administrative standards, which give it unchecked ability to deny, or dictate the terms of, a proposed transaction for almost any reason.

63.    For example, in its administrative rules effective January 1, 2023, OHA provides that it "may" appoint a community review board to participate in a comprehensive review. Or. Admin. R. 409-070-0062(1).  Whether it will do so, however, is entirely up to OHA.  The rule simply states that OHA "shall consider the potential impacts of the proposed transaction" without specifying what those impacts are or how they will be measured.  The rule (and the non-exclusive list that OHA included) does not provide any meaningful limit on OHA or notice to the parties regarding when a community review board will be required.

64.    The rule further provides that "[a] community review board shall make written recommendations to [OHA] on a proposed transaction based on the criteria listed in paragraph

(1) of this rule." Or. Admin. R. 409-070-0062(6).  Paragraph (1) contains no meaningful
"criteria" at all.

65.    The rule identifying OHA's criteria for approving (or denying or adding
conditions to) a proposed transaction includes a separate list of criteria for OHA to consider,
which expand on the already vague criteria of HB 2362.  Or. Admin. R. 409-070-0060(6).

66.    Thus, again, because the legislature has not provided any meaningful or
applicable standards, OHA unilaterally has created its own legislative criteria through
rulemaking and sub-regulatory guidance, and done so in a way that makes it unclear what criteria
will actually apply to review a proposed transaction.  OHA's approach not only fails to give
parties fair notice of what may be required of them, it creates an unacceptable risk of arbitrary
and unfair decision-making.

## V.  FIRST CLAIM FOR RELIEF AGAINST DEFENDANT ALLEN– 42 U.S.C. § 1983
### (Violation of the Due Process Clause of the Fourteenth Amendment to
### the United States Constitution)

67.    OAHHS realleges all the preceding paragraphs as if fully set forth herein.

68.    This case involves an "actual controversy" between OAHHS and Defendant Allen
concerning the constitutionality of HB 2362.  OAHHS's members are subject to HB 2362
because they are "health care entities" as defined under that law.  OAHHS's members engage in
mergers and acquisitions, new contracts, clinical affiliations, contracting affiliations, corporate
affiliations, and other transactions potentially subject to review under HB 2362.  As such,
OAHHS's members now must provide 180 days' notice of material change transactions and
subject the transaction to OHA for denial or conditions, or suffer the imposition of fees and
penalties by OHA.

115453394.46 0076593-00001

69.     HB 2362 also has frustrated OAHHS's mission, and forced OAHHS to divert its resources, all as described above.

70.     Under the Due Process Clause, "[n]o state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law."  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns:  first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  *FCC v. Fox Television*, 567 U.S. 239, 254 (2012).

71.     HB 2362 imposes costs and contains a penalty provision.  Or. Rev. Stat. § 415.900 ("In addition to any other penalty imposed by law, the Director of the Oregon Health Authority may impose a civil penalty, as determined by the director, for a violation of ORS 413.037 or 415.501.").  Section 2 of HB 2362 contains the notice and approval provisions applicable to "material change transactions."

72.     HB 2362 prohibits any entity from consummating a "material change transaction" without providing notice to, and receiving approval from, OHA.  The law, however, lacks any adequate definition of what constitutes a "health care entity" or "material change transaction," thus precluding parties from being able to determine whether they are required to provide OHA notice of, or face penalties for completing, a health care transaction.  Moreover, the legislature has not provided any criteria for OHA to use to determine whether a proposed transaction will be approved, denied, or approved with conditions.  That allows OHA to enforce the notice and penalty provisions, which includes forcing OAHHS's members to pay some undisclosed amount

Page 22   -   FIRST AMENDED COMPLAINT

of money, in an unconstitutionally arbitrary manner.  It, also, fails to provide sufficient notice of the specific criteria OHA will apply to prohibit one of OAHHS's members from entering into a proposed transaction.

73.    At all relevant times, Defendant Allen acted under color of state law when administering and enforcing HB 2362.  Specifically, Defendant Allen was exercising the authority given to him by the State of Oregon, and his actions were taken with the appearance that the State of Oregon authorized them.

74.    Defendant Allen's official conduct as the director of OHA, in administering and enforcing HB 2362, has deprived OAHHS and its members of their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as described above.

75.    OAHHS is entitled to (1) a declaration that HB 2362 is an unconstitutionally vague law, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and (2) prospective injunctive relief, prohibiting Defendant Allen from continuing to administer and enforce HB 2362.

## VI.  SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS STATE OF OREGON AND OREGON HEALTH AUTHORITY – 28 U.S.C. § 2201

### (Violation of the Nondelegation Doctrine Under the Oregon Constitution)

76.    OAHHS realleges all the preceding paragraphs as if fully set forth herein.

77.    This case involves an "actual controversy" between OAHHS and the State and OHA concerning the constitutionality of HB 2362.  OAHHS's members are subject to HB 2362 because they are "health care entities" as defined under that law.  OAHHS's members engage in mergers and acquisitions, new contracts, clinical affiliations, contracting affiliations, corporate affiliations, and other transactions potentially subject to review under HB 2362.  As such, OAHHS's members now must provide 180 days' notice of any such transaction, partnership,

Page 23   -   FIRST AMENDED COMPLAINT

affiliation, or relationship, and subject the transaction to OHA denial or conditions, or suffer the imposition of fees and penalties by OHA.

78.    HB 2362 also has frustrated OAHHS's mission, and forced OAHHS to divert its resources, all as described above.

79.    Under Oregon law, the nondelegation doctrine is based on Article III, section 1; Article IV, section 1; and Article I, section 21, of the Oregon Constitution.  Pursuant to that doctrine, a law is unconstitutional for either one of following two independent reasons:  the law (1) fails to contain objective legislative standards or a fully expressed legislative policy that guides the exercise of the delegated authority or (2) fails to furnish adequate safeguards to those who are affected by the administrative action.

80.    Accordingly, under the Oregon Constitution, the legislature was prohibited from drafting and enacting HB 2362 without also including both (1) sufficient objective legislative standards or a fully expressed legislative policy that guides the exercise of the delegated authority and (2) adequate safeguards to OAHHS's members.  HB 2362, however, does not include either, in violation of the nondelegation doctrine.

### Count 1:  Failure to Include Objective Legislative Standards

81.    Under HB 2362, OHA will prohibit a health care entity from consummating a transaction if the transaction fails to meet "criteria prescribed by the authority by rule."

82.    The legislature, then, has wholly delegated the adoption of those legislative requirements and standards to OHA.  *See* Or. Rev. Stat. § 415.501(2) ("Oregon Health Authority shall adopt by rule criteria approved by the Oregon Health Policy Board for the consideration of requests by health care entities to engage in a material change transaction and procedures for the review of material change transactions under this section.").

Page 24   -   FIRST AMENDED COMPLAINT

83.    The legislature, through HB 2362, failed to provide OHA or Oregonians with any

standards or guidance concerning what entities are subject to its notice and approval

requirements, or what, specifically, OHA can or cannot consider when reviewing a transaction.

Nor does the statute include any limits on OHA's authority to place conditions on a transaction.

Thus, HB 2362 grants OHA broad authority to enact and enforce sweeping changes to Oregon's

health care delivery system without any legislative involvement or oversight.

84.    Therefore, OAHHS is entitled to a declaration that HB 2362 unconstitutionally

fails to include sufficient objective legislative standards to guide OHA in exercising its authority

to deny, approve, or place conditions on the approval of a covered transaction, in violation of the

nondelegation doctrine under the Oregon Constitution.

### Count 2:  Failure to Furnish Adequate Safeguards

85.    HB 2362 delegates specific responsibilities to two different boards.  First, the law

delegates to the Oregon Health Policy Board, a "nine-member citizen board,"

https://www.oregon.gov/oha/ohpb/pages/index.aspx, the determination of certain review criteria

and the ability to define an important term, "health equity."  Second, the law delegates to an

OHA-chosen "community review board" consisting of "members of the affected community,

consumer advocates and health care experts" the important initial factfinding responsibilities in

the comprehensive review process.

86.    The law also includes a conflict-of-interest provision, but it applies only to "an

officer or employee" of OHA, not the Oregon Health Policy Board or the factfinding community

review board.

87.    Unlike the provision for OHA, HB 2362 does not include any conflict-of-interest

policy or other standards designed to ensure that the statutorily required lawmaking and

factfinding done by stakeholders and others under the statute is neutrally and objectively completed.

88.    In the absence of such safeguards, OAHHS is entitled to a declaration that HB 2362 violates the nondelegation doctrine under the Oregon Constitution.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

1.    On the First Claim for Relief, declare that HB 2362 is an unconstitutionally vague law, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and enter an injunction enjoining enforcement or application of HB 2362.

2.    On the Second Claim for Relief, declare that HB 2362 is in violation of the nondelegation doctrine under the Oregon Constitution.

3.    Award costs of suit and attorney fees.

4.    Award such other and further relief as the Court deems just and equitable.


DATED:  December 19, 2022

STOEL RIVES LLP


*s/ Brad S. Daniels*
BRAD S. DANIELS, OSB No. 025178
brad.daniels@stoel.com
NATHAN R. MORALES, OSB No. 145763
nathan.morales@stoel.com
Telephone:  503-294-9496

Attorneys for Plaintiff


Page 26   -    FIRST AMENDED COMPLAINT

OREGON LAWS 2021                                    Chap. 615

## CHAPTER 615

AN ACT                    HB 2362

Relating to health care providers; creating new pro-
visions; and amending ORS 413.032, 413.037,
413.101, 413.181, 415.013, 415.019 and 415.103.
Be It Enacted by the People of the State of Or-
egon:

**SECTION 1.** As used in this section and
sections 2 and 3 of this 2021 Act:
(1) "Corporate affiliation" has the meaning
prescribed by the Oregon Health Authority by
rule, including:
(a) Any relationship between two organiza-
tions that reflects, directly or indirectly, a par-
tial or complete controlling interest or partial
or complete corporate control; and
(b) Transactions that merge tax identifica-
tion numbers or corporate governance.
(2) "Essential services" means:
(a) Services that are funded on the prior-
itized list described in ORS 414.690; and
(b) Services that are essential to achieve
health equity.
(3) "Health benefit plan" has the meaning
given that term in ORS 743B.005.
(4)(a) "Health care entity" includes:
(A) An individual health professional li-
censed or certified in this state;
(B) A hospital, as defined in ORS 442.015, or
hospital system, as defined by the authority by
rule;
(C) A carrier, as defined in ORS 743B.005,
that offers a health benefit plan in this state;
(D) A Medicare Advantage plan;
(E) A coordinated care organization or a
prepaid managed care health services organiza-
tion, as both terms are defined in ORS 414.025;
and
(F) Any other entity that has as a primary
function the provision of health care items or
services or that is a parent organization of, or
is an entity closely related to, an entity that has
as a primary function the provision of health
care items or services.
(b) "Health care entity" does not include:
(A) Long term care facilities, as defined in
ORS 442.015.
(B) Facilities licensed and operated under
ORS 443.400 to 443.455.
(5) "Health equity" has the meaning pre-
scribed by the Oregon Health Policy Board and
adopted by the authority by rule.
(6)(a) "Material change transaction" means:
(A) A transaction in which at least one party
had average revenue of $25 million or more in
the preceding three fiscal years and another
party:
(i) Had an average revenue of at least $10
million in the preceding three fiscal years; or

(ii) In the case of a new entity, is projected
to have at least $10 million in revenue in the
first full year of operation at normal levels of
utilization or operation as prescribed by the au-
thority by rule.
(B) If a transaction involves a health care
entity in this state and an out-of-state entity, a
transaction that otherwise qualifies as a mate-
rial change transaction under this paragraph
that may result in increases in the price of
health care or limit access to health care ser-
vices in this state.
(b) "Material change transaction" does not
include:
(A) A clinical affiliation of health care enti-
ties formed for the purpose of collaborating on
clinical trials or graduate medical education
programs.
(B) A medical services contract or an exten-
sion of a medical services contract.
(C) An affiliation that:
(i) Does not impact the corporate leadership,
governance or control of an entity; and
(ii) Is necessary, as prescribed by the au-
thority by rule, to adopt advanced value-based
payment methodologies to meet the health care
cost growth targets under ORS 442.386.
(D) Contracts under which one health care
entity, for and on behalf of a second health care
entity, provides patient care and services or
provides administrative services relating to,
supporting or facilitating the provision of pa-
tient care and services, if the second health care
entity:
(i) Maintains responsibility, oversight and
control over the patient care and services; and
(ii) Bills and receives reimbursement for the
patient care and services.
(E) Transactions in which a participant that
is a health center as defined in 42 U.S.C. 254b,
while meeting all of the participant's obli-
gations, acquires, affiliates with, partners with
or enters into any agreement with another en-
tity unless the transaction would result in the
participant no longer qualifying as a health
center under 42 U.S.C. 254b.
(7)(a) "Medical services contract" means a
contract to provide medical or mental health
services entered into by:
(A) A carrier and an independent practice
association;
(B) A carrier, coordinated care organization,
independent practice association or network of
providers and one or more providers, as defined
in ORS 743B.001;
(C) An independent practice association and
an individual health professional or an organ-
ization of health care providers;
(D) Medical, dental, vision or mental health
clinics; or
(E) A medical, dental, vision or mental
health clinic and an individual health profes-

1

OREGON LAWS 2021

sional to provide medical, dental, vision or mental health services.

(b) "Medical services contract" does not include a contract of employment or a contract creating a legal entity and ownership of the legal entity that is authorized under ORS chapter 58, 60 or 70 or under any other law authorizing the creation of a professional organization similar to those authorized by ORS chapter 58, 60 or 70, as may be prescribed by the authority by rule.

(8) "Net patient revenue" means the total amount of revenue, after allowance for contractual amounts, charity care and bad debt, received for patient care and services, including:

(a) Value-based payments;

(b) Incentive payments;

(c) Capitation payments or payments under any similar contractual arrangement for the prepayment or reimbursement of patient care and services; and

(d) Any payment received by a hospital to reimburse a hospital assessment under ORS 414.855.

(9) "Revenue" means:

(a) Net patient revenue; or

(b) The gross amount of premiums received by a health care entity that are derived from health benefit plans.

(10) "Transaction" means:

(a) A merger of a health care entity with another entity;

(b) An acquisition of one or more health care entities by another entity;

(c) New contracts, new clinical affiliations and new contracting affiliations that will eliminate or significantly reduce, as defined by the authority by rule, essential services;

(d) A corporate affiliation involving at least one health care entity; or

(e) Transactions to form a new partnership, joint venture, accountable care organization, parent organization or management services organization, as prescribed by the authority by rule.

**SECTION 2.** (1) The purpose of this section is to promote the public interest and to advance the goals set forth in ORS 414.018 and the goals of the Oregon Integrated and Coordinated Health Care Delivery System described in ORS 414.570.

(2) In accordance with subsection (1) of this section, the Oregon Health Authority shall adopt by rule criteria approved by the Oregon Health Policy Board for the consideration of requests by health care entities to engage in a material change transaction and procedures for the review of material change transactions under this section.

(3)(a) A notice of a material change transaction involving the sale, merger or acquisition of a domestic health insurer shall be submitted to the Department of Consumer and Business Services as an addendum to filings required by ORS 732.517 to 732.546 or 732.576. The department shall provide to the authority the notice submitted under this subsection to enable the authority to conduct a review in accordance with subsections (5) and (7) of this section. The authority shall notify the department of the outcome of the authority's review.

(b) The department shall make the final determination in material change transactions involving the sale, merger or acquisition of a domestic health insurer and shall coordinate with the authority to incorporate the authority's review into the department's final determination.

(4) An entity shall submit to the authority a notice of a material change transaction, other than a transaction described in subsection (3) of this section, in the form and manner prescribed by the authority, no less than 180 days before the date of the transaction and shall pay a fee prescribed in section 4 of this 2021 Act.

(5) No later than 30 days after receiving a notice described in subsections (3) and (4) of this section, the authority shall conduct a preliminary review to determine if the transaction has the potential to have a negative impact on access to affordable health care in this state and meets the criteria in subsection (9) of this section.

(6) Following a preliminary review, the authority or the department shall approve a transaction or approve a transaction with conditions designed to further the goals described in subsection (1) of this section based on criteria prescribed by the authority by rule, including but not limited to:

(a) If the transaction is in the interest of consumers and is urgently necessary to maintain the solvency of an entity involved in the transaction; or

(b) If the authority determines that the transaction does not have the potential to have a negative impact on access to affordable health care in this state or the transaction is likely to meet the criteria in subsection (9) of this section.

(7)(a) Except as provided in paragraph (b) of this subsection, if a transaction does not meet the criteria in subsection (6) of this section, the authority shall conduct a comprehensive review and may appoint a review board of stakeholders to conduct a comprehensive review and make recommendations as provided in subsections (11) to (18) of this section. The authority shall complete the comprehensive review no later than 180 days after receipt of the notice unless the parties to the transaction agree to an extension of time.

(b) The authority or the department may intervene in a transaction described in section 1 (6)(a)(C) of this 2021 Act in which the final au-

thority rests with another state and, if the transaction is approved by the other state, may place conditions on health care entities operating in this state with respect to the insurance or health care industry market in this state, prices charged to patients residing in this state and the services available in health care facilities in this state, to serve the public good.

(8) The authority shall prescribe by rule:

(a) Criteria to exempt an entity from the requirements of subsection (4) of this section if there is an emergency situation that threatens immediate care services and the transaction is urgently needed to protect the interest of consumers;

(b) Provision for the authority's failure to complete a review under subsection (5) of this section within 30 days; and

(c) Criteria for when to conduct a comprehensive review and appoint a review board under subsection (7) of this section that must include, but is not limited to:

(A) The potential loss or change in access to essential services;

(B) The potential to impact a large number of residents in this state; or

(C) A significant change in the market share of an entity involved in the transaction.

(9) A health care entity may engage in a material change transaction if, following a comprehensive review conducted by the authority and recommendations by a review board appointed under subsection (7) of this section, the authority determines that the transaction meets the criteria adopted by the department by rule under subsection (2) of this section and:

(a)(A) The parties to the transaction demonstrate that the transaction will benefit the public good and communities by:

(i) Reducing the growth in patient costs in accordance with the health care cost growth targets established under ORS 442.386 or maintain a rate of cost growth that exceeds the target that the entity demonstrates is the best interest of the public;

(ii) Increasing access to services in medically underserved areas; or

(iii) Rectifying historical and contemporary factors contributing to a lack of health equities or access to services; or

(B) The transaction will improve health outcomes for residents of this state; and

(b) There is no substantial likelihood of anticompetitive effects from the transaction that outweigh the benefits of the transaction in increasing or maintaining services to underserved populations.

(10) The authority may suspend a proposed material change transaction if necessary to conduct an examination and complete an analysis of whether the transaction is consistent with subsection (9) of this section and the criteria

adopted by rule under subsection (2) of this section.

(11)(a) A review board convened by the authority under subsection (7) of this section must consist of members of the affected community, consumer advocates and health care experts. No more than one-third of the members of the review board may be representatives of institutional health care providers. The authority may not appoint to a review board an individual who is employed by an entity that is a party to the transaction that is under review or is employed by a competitor that is of a similar size to an entity that is a party to the transaction.

(b) A member of a review board shall file a notice of conflict of interest and the notice shall be made public.

(12) The authority may request additional information from an entity that is a party to the material change transaction, and the entity shall promptly reply using the form of communication requested by the authority and verified by an officer of the entity if required by the authority.

(13)(a) An entity may not refuse to provide documents or other information requested under subsection (4) or (12) of this section on the grounds that the information is confidential.

(b) Material that is privileged or confidential may not be publicly disclosed if:

(A) The authority determines that disclosure of the material would cause harm to the public;

(B) The material may not be disclosed under ORS 192.311 to 192.478; or

(C) The material is not subject to disclosure under ORS 705.137.

(c) The authority shall maintain the confidentiality of all confidential information and documents that are not publicly available that are obtained in relation to a material change transaction and may not disclose the information or documents to any person, including a member of the review board, without the consent of the person who provided the information or document.  Information and documents described in this paragraph are exempt from disclosure under ORS 192.311 to 192.478.

(14) The authority or the Department of Justice may retain actuaries, accountants or other professionals independent of the authority who are qualified and have expertise in the type of material change transaction under review as necessary to assist the authority in conducting the analysis of a proposed material change transaction. The authority or the Department of Justice shall designate the party or parties to the material change transaction that shall bear the reasonable and actual cost of retaining the professionals.

(15) A review board may hold up to two public hearings to seek public input and otherwise engage the public before making a determination on the proposed transaction. A public

hearing must be held in the service area or areas of the health care entities that are parties to the material change transaction. At least 10 days prior to the public hearing, the authority shall post to the authority's website information about the public hearing and materials related to the material change transaction, including:

(a) A summary of the proposed transaction;

(b) An explanation of the groups or individuals likely to be impacted by the transaction;

(c) Information about services currently provided by the health care entity, commitments by the health care entity to continue such services and any services that will be reduced or eliminated;

(d) Details about the hearings and how to submit comments, in a format that is easy to find and easy to read; and

(e) Information about potential or perceived conflicts of interest among executives and members of the board of directors of health care entities that are parties to the transaction.

(16) The authority shall post the information described in subsection (15)(a) to (d) of this section to the authority's website in the languages spoken in the area affected by the material change transaction and in a culturally sensitive manner.

(17) The authority shall provide the information described in subsection (15)(a) to (d) of this section to:

(a) At least one newspaper of general circulation in the area affected by the material change transaction;

(b) Health facilities in the area affected by the material change transaction for posting by the health facilities; and

(c) Local officials in the area affected by the material change transaction.

(18) A review board shall make recommendations to the authority to approve the material change transaction, disapprove the material change transaction or approve the material change transaction subject to conditions, based on subsection (9) of this section and the criteria adopted by rule under subsection (2) of this section. The authority shall issue a proposed order and allow the parties and the public a reasonable opportunity to make written exceptions to the proposed order. The authority shall consider the parties' and the public's written exceptions and issue a final order setting forth the authority's findings and rationale for adopting or modifying the recommendations of the review board. If the authority modifies the recommendations of the review board, the authority shall explain the modifications in the final order and the reasons for the modifications. A party to the material change transaction may contest the final order as provided in ORS chapter 183.

(19) A health care entity that is a party to an approved material change transaction shall notify the authority upon the completion of the transaction in the form and manner prescribed by the authority. One year, two years and five years after the material change transaction is completed, the authority shall analyze:

(a) The health care entities' compliance with conditions placed on the transaction, if any;

(b) The cost trends and cost growth trends of the parties to the transaction; and

(c) The impact of the transaction on the health care cost growth target established under ORS 442.386.

(20) The authority shall publish the authority's analyses and conclusions under subsection (19) of this section and shall incorporate the authority's analyses and conclusions under subsection (19) of this section in the report described in ORS 442.386 (6).

(21) This section does not impair, modify, limit or supersede the applicability of ORS 65.800 to 65.815, 646.605 to 646.652 or 646.705 to 646.805.

(22) Whenever it appears to the Director of the Oregon Health Authority that any person has committed or is about to commit a violation of this section or any rule or order issued by the authority under this section, the director may apply to the Circuit Court for Marion County for an order enjoining the person, and any director, officer, employee or agent of the person, from the violation, and for such other equitable relief as the nature of the case and the interest of the public may require.

(23) The remedies provided under this section are in addition to any other remedy, civil or criminal, that may be available under any other provision of law.

(24) The authority may adopt rules necessary to carry out the provisions of this section.

SECTION 3. (1) An officer or employee of the Oregon Health Authority who is delegated responsibilities in the enforcement of section 2 of this 2021 Act or rules adopted pursuant to section 2 of this 2021 Act may not:

(a) Be a director, officer or employee of or be financially interested in an entity that is a party to a proposed material change transaction except as an enrollee or patient of a health care entity or by reason of rights vested in compensation or benefits related to services performed prior to affiliation with the authority; or

(b) Be engaged in any other business or occupation interfering with or inconsistent with the duties of the authority.

(2) This section does not permit any conduct, affiliation or interest that is otherwise prohibited by public policy.

SECTION 4. (1) The Oregon Health Authority shall prescribe by rule a fee to be paid under section 2 (3) of this 2021 Act, proportionate to the size of the parties to the transaction, sufficient to reimburse the costs of administering section 2 of this 2021 Act.

        

(2) Moneys received by the authority under this section shall be deposited to the Oregon Health Authority Fund established in ORS 413.101 to be used for carrying out section 2 of this 2021 Act.

**SECTION 5.** (1) In addition to any other penalty imposed by law, the Director of the Oregon Health Authority may impose a civil penalty, as determined by the director, for a violation of ORS 413.037 or section 2 of this 2021 Act. The amount of the civil penalty may not exceed $10,000 for each offense. The civil penalty imposed on an individual health professional may not exceed $1,000 for each offense.

(2) Civil penalties shall be imposed and enforced in accordance with ORS 183.745.

(3) Moneys received by the Oregon Health Authority under this section shall be paid to the State Treasury and credited to the General Fund.

**SECTION 6.** Every four years, the Oregon Health Authority shall commission a study of the impact of health care consolidation in this state. The study must review consolidation occurring during the previous four-year period and include an analysis of:

(1) The impact on costs to consumers for health care either to the benefit or the detriment of consumers; and

(2) Any increases or decreases in the quality of care, including:

(a) Improvement or reductions in morbidity;

(b) Improvement or reductions in the management of population health;

(c) Changes to health and patient outcomes, particularly for underserved and uninsured individuals, recipients of medical assistance and other low-income individuals and individuals living in rural areas, as measured by nationally recognized measures of the quality of health care, such as measures used or endorsed by the National Committee for Quality Assurance, the National Quality Forum, the Physician Consortium for Performance Improvement or the Agency for Healthcare Research and Quality.

**SECTION 6a.** The Oregon Health Authority shall commission the first study under section 6 of this 2021 Act no later than September 15, 2026.

**SECTION 7.** ORS 413.101 is amended to read:

413.101. The Oregon Health Authority Fund is established in the State Treasury, separate and distinct from the General Fund. Interest earned by the Oregon Health Authority Fund shall be credited to the fund. Moneys in the fund are continuously appropriated to the Oregon Health Authority for carrying out the duties, functions and powers of the authority under ORS 413.032 and 431A.183 **and section 2 of this 2021 Act.**

**SECTION 8.** ORS 413.032 is amended to read:

413.032. (1) The Oregon Health Authority is established. The authority shall:

(a) Carry out policies adopted by the Oregon Health Policy Board;

(b) Administer the Oregon Integrated and Coordinated Health Care Delivery System established in ORS 414.570;

(c) Administer the Oregon Prescription Drug Program;

(d) Develop the policies for and the provision of publicly funded medical care and medical assistance in this state;

(e) Develop the policies for and the provision of mental health treatment and treatment of addictions;

(f) Assess, promote and protect the health of the public as specified by state and federal law;

(g) Provide regular reports to the board with respect to the performance of health services contractors serving recipients of medical assistance, including reports of trends in health services and enrollee satisfaction;

(h) Guide and support, with the authorization of the board, community-centered health initiatives designed to address critical risk factors, especially those that contribute to chronic disease;

(i) Be the state Medicaid agency for the administration of funds from Titles XIX and XXI of the Social Security Act and administer medical assistance under ORS chapter 414;

(j) In consultation with the Director of the Department of Consumer and Business Services, periodically review and recommend standards and methodologies to the Legislative Assembly for:

(A) Review of administrative expenses of health insurers;

(B) Approval of rates; and

(C) Enforcement of rating rules adopted by the Department of Consumer and Business Services;

(k) Structure reimbursement rates for providers that serve recipients of medical assistance to reward comprehensive management of diseases, quality outcomes and the efficient use of resources and to promote cost-effective procedures, services and programs including, without limitation, preventive health, dental and primary care services, web-based office visits, telephone consultations and telemedicine consultations;

(L) Guide and support community three-share agreements in which an employer, state or local government and an individual all contribute a portion of a premium for a community-centered health initiative or for insurance coverage;

(m) Develop, in consultation with the Department of Consumer and Business Services, one or more products designed to provide more affordable options for the small group market;

(n) Implement policies and programs to expand the skilled, diverse workforce as described in ORS 414.018 (4); and

(o) Implement a process for collecting the health outcome and quality measure data identified by the

Health Plan Quality Metrics Committee and report the data to the Oregon Health Policy Board.

(2) The Oregon Health Authority is authorized to:

(a) Create an all-claims, all-payer database to collect health care data and monitor and evaluate health care reform in Oregon and to provide comparative cost and quality information to consumers, providers and purchasers of health care about Oregon's health care systems and health plan networks in order to provide comparative information to consumers.

(b) Develop uniform contracting standards for the purchase of health care, including the following:

(A) Uniform quality standards and performance measures;

(B) Evidence-based guidelines for major chronic disease management and health care services with unexplained variations in frequency or cost;

(C) Evidence-based effectiveness guidelines for select new technologies and medical equipment;

(D) A statewide drug formulary that may be used by publicly funded health benefit plans; and

(E) Standards that accept and consider tribal-based practices for mental health and substance abuse prevention, counseling and treatment for persons who are Native American or Alaska Native as equivalent to evidence-based practices.

(3) The enumeration of duties, functions and powers in this section is not intended to be exclusive nor to limit the duties, functions and powers imposed on or vested in the Oregon Health Authority by ORS 413.006 to 413.042, 415.012 to 415.430 and 741.340 **and section 2 of this 2021 Act** or by other statutes.

**SECTION 9.** ORS 413.037 is amended to read:
413.037. (1) The Director of the Oregon Health Authority, each deputy director and authorized representatives of the director may administer oaths, take depositions and issue subpoenas to compel the attendance of witnesses and the production of documents or other written information necessary to carry out the provisions of ORS 413.006 to 413.042, 415.012 to 415.430 and 741.340 **and section 2 of this 2021 Act**.

(2) If any person fails to comply with a subpoena issued under this section or refuses to testify on matters on which the person lawfully may be interrogated, the director, deputy director or authorized representative may follow the procedure set out in ORS 183.440 to compel obedience.

**SECTION 10.** ORS 413.181 is amended to read:
413.181. (1) The Department of Consumer and Business Services and the Oregon Health Authority may enter into agreements governing the disclosure of information reported to the department by insurers with certificates of authority to transact insurance in this state and the disclosure of information reported to the Oregon Health Authority by coordinated care organizations.

(2) The authority may use information disclosed under subsection (1) of this section for the purpose of carrying out ORS 413.032, 414.572, 414.591, 414.605, 414.609, 414.638 and 415.012 to 415.430 **and section 2 of this 2021 Act**.

**SECTION 11.** ORS 415.013 is amended to read:
415.013. (1) The Oregon Health Authority shall enforce the provisions of ORS 415.012 to 415.430 **and section 2 of this 2021 Act** and rules adopted pursuant to ORS 415.011 **and 415.012 to 415.430 and section 2 of this 2021 Act** for the public good.

(2) The authority has the powers and authority expressly conferred by or reasonably implied from the provisions of ORS 415.012 to 415.430 **and section 2 of this 2021 Act** and rules adopted pursuant to ORS 415.011 **and 415.012 to 415.430 and section 2 of this 2021 Act**.

(3) The authority may conduct examinations and investigations [*of matters concerning the regulation of coordinated care organizations as the authority considers proper to determine whether any person has violated any provision of ORS 415.012 to 415.430 or rules adopted pursuant to ORS 415.011 or to secure information useful in the lawful administration of any of ORS 415.011 the provisions*] **and require the production of books, records, accounts, papers, documents and computer and other recordings the authority considers necessary to administer and enforce ORS 415.012 to 415.430 or section 2 of this 2021 Act and any rules adopted pursuant to ORS 415.011 or 415.012 to 415.430 or section 2 of this 2021 Act**.

**SECTION 12.** ORS 415.019 is amended to read:
415.019. (1) The Oregon Health Authority shall hold a contested case hearing upon written request for a hearing by a person aggrieved by any act, threatened act or failure of the authority to act under ORS 415.012 to 415.430 **or section 2 of this 2021 Act** or rules adopted pursuant to ORS 415.011 **or 415.012 to 415.430 or section 2 of this 2021 Act**.

(2) The provisions of ORS chapter 183 govern the hearing procedures and any judicial review of a final order issued in a contested case hearing.

**SECTION 13.** ORS 415.103 is amended to read:
415.103. A person may not file or cause to be filed with the Oregon Health Authority any article, certificate, report, statement, application or other information required or permitted to be filed under ORS 415.012 to 415.430 **or section 2 of this 2021 Act** or rules adopted pursuant to ORS 415.011 **or 415.012 to 415.430 or section 2 of this 2021 Act** that is known by the person to be false or misleading in any material respect.

**SECTION 14. Section 2 of this 2021 Act becomes operative on March 1, 2022.**
Approved by the Governor July 27, 2021
Filed in the office of Secretary of State August 2, 2021
Effective date January 1, 2022
_____