BRAD S. DANIELS
brad.daniels@stoel.com
NATHAN R. MORALES
nathan.morales@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480

*Attorneys for Plaintiff Oregon Association of Hospitals
and Health Systems*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON ASSOCIATION OF HOSPITALS AND HEALTH SYSTEMS,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>STATE OF OREGON; OREGON HEALTH AUTHORITY, and DAVID BADEN, in his official capacity as Director of Oregon Health Authority,<br><br>　　　　　Defendants. | Case No.: 3:22-cv-1486-SI<br><br>**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

## <u>TABLE OF CONTENTS</u>

**Page**

LOCAL RULE 7-1 CERTIFICATION ........................................................ 1

MOTION ......................................................................................... 1

I.  INTRODUCTION ........................................................................ 1

II.  STATEMENT OF FACTS............................................................ 3

    A.    Relevant Statutory Provisions and Structure of HB 2362 ................ 3

        1.    Triggering Definitions ................................................... 3

        2.    Notice and Review Requirements.................................... 6

III.  STANDARD OF REVIEW ........................................................... 9

IV.  COMBINED ARGUMENT ........................................................... 9

    A.    HB 2632 Violates the Due Process Clause ................................ 9

        1.    A Facial Vagueness Challenge Does Not Require Proof
            that a Statute Is Vague in All of Its Applications.................. 9

        2.    The Void for Vagueness Doctrine.................................... 11

        3.    HB 2362's Definition of "Health Care Entity" Is
            Unconstitutionally Vague ....................................... 13

        4.    HB 2362 Is Fatally Vague as to the Transactions Subject
            to Its Provisions ................................................... 15

        5.    The Absence of Legislatively Enacted Review Criteria
            Fails to Provide Notice and Encourages Arbitrary
            Enforcement ....................................................... 18

        6.    The OHA Regulations and Sub-Regulatory Guidance
            Do Not Solve the Vagueness Problem. .......................... 19

    B.    HB 2362 Violates the Non-Delegation Requirement of the
        Oregon Constitution ......................................................... 24

        1.    Contrary to Defendants' Interpretation, the Non-Delegation
            Doctrine Is Not Limited to Adequate Procedural Safeguards........... 24

2.    HB 2362 Does Not Include a Full Expression of Legislative Policy to Guide the Agency's Authority ................................................ 26

3.    HB 2362 Fails to Establish Sufficient Procedural Safeguards to Protect Against Arbitrary Action by the Private Boards ............... 30

4.    The Possibility of APA Review Does Not Immunize the Legislative Delegation ............................................................................ 33

C.    The Court Should Retain Jurisdiction over Plaintiff's State Law Claims .................................................................................................... 34

V.  CONCLUSION ............................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Apparel & Footwear Ass'n, Inc. v. Allen*,
  608 F. Supp. 3d 1005 (D. Or. 2022) ....................................................11

*Boutilier v. INS*,
  387 U.S. 118, 87 S. Ct. 1563, 18 L.Ed.2d 661 (1967)............................12

*City of Damascus v. Brown*,
  266 Or. App. 416, 337 P.3d 1019 (2014)......................................... *passim*

*Corvallis Lodge No. 1411 Loyal Ord. of Moose v. Oregon Liquor Control Comm'n*
  67 Or. App. 15, 677 P.2d 76 (1984)...................................30, 31, 33, 34

*Eastern Oregon Mining Assoc. v. Dept. of Envtl. Quality*,
  360 Or. 10 (2016)............................................................................33

*Fair Hous. Council v. Riverside Two*,
  249 F.3d 1132 (9th Cir. 2001) ...........................................................9

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239, 132 S. Ct. 2307, 183 L.Ed.2d 234 (2012)...........11, 12, 18

*General Electric Co. v. Wahle*,
  207 Or. 302 (1956)......................................................................34, 35

*Grayned v. City of Rockford*,
  408 U.S. 104, 92 S. Ct. 2294, 33 L.Ed.2d 222 (1972)................12, 18, 20

*Guerrero v. Whitaker*,
  908 F.3d 541 (9th Cir. 2018) .......................................................10, 11

*Gundy v. United States*,
  588 U.S. ___, 139 S. Ct. 2116, 204 L. Ed. 2d 522 (2019) ....................25

*Helicopters for Agriculture v. Cty. of Napa*,
  384 F.Supp.3d 1035 (N.D. Cal. 2019) .................................................10

*Hill v. Colorado*,
  530 U.S. 703, 120 S. Ct. 2480, 147 L.Ed.2d 597 (2000).......................11

*Hotel & Motel Ass'n of Oakland v. City of Oakland*,
  344 F.3d 959 (9th Cir. 2003) ...........................................................11

Page iii –    PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
               OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Int'l Refugee Assistance Project v. Trump*,
883 F.3d 233 (4th Cir. 2018), *vacated by*
*Trump v. Int'l Refugee Assistance Project*, 585 U.S. ___,
138 S. Ct. 2710, 201 L.Ed.2d 1094 (2018) .......................................................................29

*Johnson v. United States*,
576 U.S. 591, 135 S. Ct. 2551, 192 L.Ed.2d 569 (2015) ................................10, 12, 15

*Krause v. Titleserv, Inc.*,
402 F.3d 119 (2d Cir. 2005) ...........................................................................................16

*Langlotz v. Noelle*,
179 Or. App. 317, 39 P.3d 271 (2002) ...........................................................................13

*Medford Firefighters Assn. v. City of Medford*,
40 Or. App. 519(1979) .....................................................................................................32

*Mistretta v. United States*,
488 U.S. 361, 109 S. Ct. 647, 102 L. Ed. 2d 714 (1989) ..............................................25

*Monaghan v. School Dist. No. 1, Clackamas County*,
211 Or. 360, 315 P.2d 797 (1957) ..................................................................................24

*Moreland v. Las Vegas Metro. Police Dep't*,
159 F.3d 365 (9th Cir. 1998) ............................................................................................9

*Sessions v. Dimaya*,
138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018) ...............................................10, 13, 27

*Synar v. United States*,
626 F. Supp. 1374 (D.D.C. 1986) ...................................................................................29

*United States v. L. Cohen Grocery Co.*,
255 U.S. 8141 S. Ct. 298 (1921) ....................................................................................20

*United States v. Salerno*,
481 U.S. 739, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987) ...............................................10

*Van Winkle v. Fred Meyer, Inc.*,
151 Or. 455, 49 P.2d 1140 (1935) ..................................................................................24

*Whitman v. American Trucking Associations, Inc.*,
531 U.S. 457, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001) ...................................................28

*Williams v. Alameda Cty.*,
No. 3:22-cv-01274-LB, 2022 WL 17169833 (N.D. Cal. Nov. 22, 2022) ........................11

**Statutes**

Armed Career Criminal Act ..................................................................................................15

Or. Rev. Stat. § 183.480(2) ................................................................................................33

Or. Rev. Stat. § 183.482(8) ................................................................................................34

Or. Rev. Stat. § 183.484(5) ................................................................................................34

Or. Rev. Stat. § 415.500(1) ..................................................................................................5

Or. Rev. Stat. § 415.500(2) .........................................................................................16, 20

Or. Rev. Stat. § 415.500(2)(a)-(b) ........................................................................................5

Or. Rev. Stat. § 415.500(4) ..................................................................................................3

Or. Rev. Stat. § 415.500(4)(a) ............................................................................................13

Or. Rev. Stat. § 415.500(4)(a)(A)-(F) ..................................................................................3

Or. Rev. Stat. § 415.500(4)(a)(B) ...................................................................................3, 13

Or. Rev. Stat. § 415.500(4)(a)(F) ....................................................................................4, 14

Or. Rev. Stat. § 415.500(5) ..........................................................................................*passim*

Or. Rev. Stat. § 415.500(10) ...........................................................................................4, 16

Or. Rev. Stat. § 415.500(10)(c) ..........................................................................................16

Or. Rev. Stat. § 415.500(10)(e) ..........................................................................................18

Or. Rev. Stat. § 415.501(2) ................................................................................................27

Or. Rev. Stat. § 415.501(3), (4) ............................................................................................6

Or. Rev. Stat. § 415.501(4)-(5) ........................................................................................6, 27

Or. Rev. Stat. § 415.501(6) ................................................................................................28

Or. Rev. Stat. § 415.501(6)(a)-(b) ........................................................................................6

Or. Rev. Stat. § 415.501(7) ..........................................................................................7, 8, 30

Or. Rev. Stat. § 415.501(7)(a) ............................................................................................32

Or. Rev. Stat. § 415.501(9) ....................................................................................7, 8, 19, 28

Or. Rev. Stat. § 415.501(9)(a) ...................................................................................7

Or. Rev. Stat. § 415.501(9)(b) ...................................................................................7

Or. Rev. Stat. § 415.501(11) .....................................................................................30

Or. Rev. Stat. § 415.501(11)(a) .................................................................................32

Or. Rev. State.§ 415.501(14) ......................................................................................9

Or. Rev. Stat. § 415.501(15) ................................................................................30, 31

Or. Rev. Stat. § 415.501(18) .....................................................................................31

Or. Rev. Stat. § 415.501(22) ......................................................................................9

Or. Rev. Stat. § 415.505 ...........................................................................................32

Or. Rev. Stat. § 415.512 .............................................................................................8

Or. Rev. Stat. § 415.900 .............................................................................................9

**Other Authorities**

Fed. R. Civ. P. 56(a) ...................................................................................................9

Fed. R. Evid. 201 .......................................................................................................1

Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121
      YALE L.J. 1672, 1722 (2012) ............................................................................20

Oregon Administrative Procedures Act (APA) ....................................................33, 34

Or. Admin. R. 409-070-0005(18) .............................................................................21

Or.. Admin. R. 409-070-0005(28) .............................................................................21

Or. Admin. R. 409-070-0010(1)(e)(A) ......................................................................18

Or. Admin. R. 409-070-0010(3) ...............................................................................22

Or. Admin. R. 409-070-0060(6)(a)(B) ..................................................................8, 28

Or. Admin. R. 409-070-0060(6)(a)(D) ......................................................................19

Or. Admin. R. 845–08–045 .......................................................................................33

Oregon Constitution............................................................................................ *passim*

Oregon Health Authority, *Defining Essential Services & Significant Reduction*,
https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO-Essential-Services-and-Significant-Reduction-
Guidance-FINAL.pdf (last accessed on July 14, 2023)............................................................21, 22

United States Constitution, Due Process Clause of the Fourteenth Amendment ......1,9, 12, 20, 35

Oregon HB 2362 ........................................................................................................................ *passim*

## LOCAL RULE 7-1 CERTIFICATION

Pursuant to Local Rule 7-1(a), counsel for Plaintiff Oregon Association of Hospitals and Health Systems ("Plaintiff" or "OAHHS") conferred with counsel for Defendants State of Oregon, Oregon Health Authority, and David Baden in his official capacity as current Director of the Oregon Health Authority (collectively, "Defendants" or "OHA") in good faith, but the parties were unable to resolve the issues raised in this Motion.

## MOTION

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff respectfully cross-moves for summary judgment in its favor, and against Defendants, on both claims in Plaintiff's First Amended Complaint (ECF No. 14).  In support of this Motion, OAHHS relies on the following Memorandum of Law, the pleadings and documents on file, and the facts submitted below, which all are undisputed and subject to judicial notice.  *See* Fed. R. Evid. 201 (authorizing Court to take judicial notice of certain facts).

## I.  INTRODUCTION

A state legislature's power to legislate in the economic arena is broad, but not unlimited. Under the Due Process Clause of the Fourteenth Amendment, even civil laws—and especially civil laws that prohibit conduct, impose penalties, and risk government sanctions and attendant harm— must be sufficiently clear so that regulated parties have fair notice of the prohibited conduct, and arbitrary or discriminatory enforcement is not encouraged.  Similarly, under various provisions of the Oregon Constitution, the legislature is prohibited from delegating the legislative power to make law.  Those principles—the federal void-for-vagueness doctrine and the state nondelegation doctrine—both ensure that, at the most basic level, the legislature adequately informs the public *and* the executive branch of legislative policy and prohibitions—what the law requires and what

must be done to conform to the law.  Those doctrines also guard against impermissible delegation of lawmaking authority, which undermines the separation of powers and encourages arbitrary enforcement.

During the 2021 Regular Session, the Oregon Legislature passed a first-of-its-kind statute—HB 2362—that violates both federal and state constitutional principles.  HB 2362 is not simply a policy choice about regulating the health care market.  It does not merely authorize OHA to fill in the gaps of a statute that otherwise provides clear direction to the agency that enforces it and the parties who are subject to its requirements.  And it is not a licensing regime that empowers an agency to regulate health care providers based on objective criteria related to patient safety, scope of practice, or financial stability.  Instead, HB 2362 provides OHA with new and boundless authority to deny or dictate conditions on a wide array of health care transactions.  After HB 2362, hospitals and many others that may be classified as "health care entities" must navigate a blizzard of agency requirements without any statutory limits on either the criteria that OHA may use to review transactions, or the types of conditions OHA may place on such transactions.  Compliance with the law depends on the agency's say so, and not on any clear and fully expressed legislative policy.

HB 2362 undoubtedly addresses novel and complex issues.  And the market that it regulates is similarly complex and highly regulated.  The text and context of HB 2362, however, produce a simple and clearly stated result:  The legislature told OHA to do the legislature's job.  Pursuant to HB 2362, OHA determines what a health care entity is and whether a material change transaction by a health care entity is lawful or unlawful based on standards that the agency alone could develop.  Wherever one draws the constitutional line, HB 2362 crosses it.  For the reasons

outlined below, Plaintiff is entitled to summary judgment on its federal Due Process claim and its
state constitutional claim.

## II.  STATEMENT OF FACTS

**A.    Relevant Statutory Provisions and Structure of HB 2362**

**1.    Triggering Definitions**

HB 2362 is unique—and constitutionally problematic—in several ways, beginning with the

legislature's attempt to define who and what would be covered by the law in the first instance.

HB 2362 is triggered when any "health care entity" plans to engage in a "material change

transaction."

As to whom the law covers, HB 2362 provides:

> (4)(a) "Health care entity" *includes*:
>
> * * * *
>
> (B) A hospital, as defined in ORS 442.015, or hospital system, *as defined by the
> authority by rule*;
>
> * * * *
>
> (F) *Any other entity that has as a primary function the provision of health care
> items or services or that is a parent organization of, or is an entity closely related
> to, an entity that has as a primary function the provision of health care items or
> services*.

Or. Rev. Stat. § 415.500(4)(a)(A)-(F) (emphases added).

As an initial matter, the statutory definition for "health care entity" does not purport to be

exclusive.  The law does not state what a "health care entity" *means*; rather, it states what types of

entities the phrase "health care entity" *includes*.

Even as to which entities it includes, subsection (4) is unclear in two fundamental ways.

First, the statute does not define "hospital system" in subsection (B).  Although the terms

"hospital" and "system" are individually terms of common meaning, they have no general or

Page 3 –    PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
             OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

specialized meaning when combined.  Instead, the statute expressly states that "hospital system" has whatever definition OHA establishes by rule, subject to no legislative guidance.  Second, by its terms subsection (F) encompasses entities that either have as their "primary function" the provision of health care items or services, or are parent organizations or are closely related to, such entities. That subsection, however, does not define any of those key phrases, including "primary function," "closely related to," or "health care items or services."

In addition to an open-ended definition of entities that may be subject to the law's requirements, the definition of "material change transaction" is exceedingly broad.  Oregon Revised Statutes § 415.500(10) provides that:

> "Transaction" means:
>
> (a) A merger of a health care entity with another entity;
>
> (b) An acquisition of one or more health care entities by another entity;
>
> (c) *New contracts, new clinical affiliations and new contracting affiliations that will eliminate or significantly reduce, as defined by the authority by rule, essential services*;
>
> (d) *A corporate affiliation* involving at least one health care entity;
>
> or
>
> (e) Transactions to form a new partnership, joint venture, accountable care organization, parent organization or management services organization, as prescribed by the authority by rule.

(Emphases added.)

Thus, the definition of "transaction" includes not only mergers and acquisitions, but "[n]ew contracts, new clinical affiliations and new contracting affiliations that will eliminate or significantly reduce, as defined by the authority by rule, essential services."  In that way, the law covers a wide array of contractual arrangements, but leaves to OHA the critical further step— defining which contractual arrangements the law covers.

Page 4 –     PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
             OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The legislature's open-ended delegation to OHA arises in two respects.  The legislature did not define or provide any standard by which to assess when a service would be eliminated or "significantly" reduced.  As explained below, OHA has attempted to fill that gap by promulgating rules that, if not inconsistent with the plain meaning of that phrase, further demonstrate its unpredictability and vagueness.  In addition, HB 2362 defines "essential services" to mean:

> (a) Services that are funded on the prioritized list described in ORS 414.690; and

> (b) Services that are essential to achieve health equity.

Or. Rev. Stat. § 415.500(2)(a)-(b).

The key phrase "health equity" is not defined by the legislature.  Instead, HB 2362 provides that the statutory phrase "health equity" is whatever OHA and the Oregon Health Policy Board ("OHPB") decide.  *See* Or. Rev. Stat. § 415.500(5) ("'Health equity' has the meaning prescribed by the Oregon Health Policy Board and adopted by the authority by rule.").  As a result, parties are left guessing who the law regulates and what transactions will trigger the law's requirements, both of which are subject to the agency's complete discretion.

As another example, the definition of "transaction" includes "a corporate affiliation involving at least one health care entity."  Coupled with the lack of adequate definitions applicable to "health care entity," the incomplete definition of "corporate affiliation" results in prohibitions on an undefined sweep of arrangements involving an undefined range of entities.  "Corporate affiliation," has the meaning prescribed by OHA by rule including two examples provided by the legislature.  Or. Rev. Stat. § 415.500(1).  In those ways, the legislature left entirely open to interpretation both the subject of the transaction and the scope of the impact necessary to comply with law.

##    2.    Notice and Review Requirements

HB 2362 establishes four stages applicable to health care entities who plan to engage in a material change transaction:  (1) notice, (2) preliminary review, (3) comprehensive review, and (4) fees and penalties.  Ultimately, as explained below, OHA determines whether a transaction will be approved, denied, or approved with OHA's conditions based on criteria that OHA—not the legislature—develops.

With respect to notice, HB 2362 requires any health care entity to provide OHA not less than 180 days' advanced notice of any material change transaction.  Or. Rev. Stat. § 415.501(3), (4).  After receiving the required notice from the parties, the legislature directed OHA to "conduct a preliminary review to determine if the transaction has the potential to have a negative impact on access to affordable health care in this state ***and*** meets the criteria in subsection (9) of this section."  *Id*. § 415.501(4).  Following preliminary review, a proposed transaction "shall" be approved or approved with conditions "based on criteria prescribed by the authority by rule, including but not limited to:

> (a) If the transaction is in the interest of consumers and is urgently necessary to maintain the solvency of an entity involved in the transaction; or
>
> (b) If the authority determines that the transaction does not have the potential to have a negative impact on access to affordable health care in this state ***or the transaction is likely to meet the criteria in subsection (9) of this section***."

Or. Rev. Stat. § 415.501(6)(a)-(b) (emphasis added).

There are several issues with this purported standard.  First, the legislature left it to OHA to determine "criteria prescribed by the authority by rule" and that broad delegation was further highlighted with statutory language of "including but not limited to" before more detailed criteria was provided by the legislature.

Even the detailed criteria raise concerns.  The cross-references to "subsection (9) of this section" in both subsection (4) and subsection (6) are critical, because, by referring back to that subsection, the legislature left it to OHA to establish the criteria to be used when approving or denying a material change transaction at the preliminary review stage.  There are multiple reasons why this is true.  Subsection (9) includes in the required criteria "[r]ectifying historical and contemporary factors contributing to a lack of health equities."  Or. Rev. Stat. § 415.501(9).  As previously noted, "health equity" has "the meaning prescribed by the Oregon Health Policy Board and adopted by the authority by rule."  Or. Rev. Stat. § 415.500(5).  Even more problematically, the statute also indicates that, to be preliminarily approved, the transaction must comply with "the criteria adopted by [OHA] by rule under subsection (2) of this section."

As a result, in order to achieve preliminary approval, a material change transaction must satisfy the criteria established by the agency, but no section of the statute further identifies or limits—in even the most general way—what those criteria might be.  The legislature gave the agency the complete discretion to determine on a preliminary basis whether to approve, deny or approve with conditions any transaction involving any health care entity.

If a transaction fails to meet OHA's standards for preliminary approval, then OHA conducts a "comprehensive review."  Or. Rev. Stat. § 415.501(7).  The comprehensive review stage involves two features that are significant for purposes of this case.  First, the stated criteria for approval are a conjunctive list.  Parties seeking to enter into a material change transaction must demonstrate both (1) that the transaction will "benefit the public good and communities" by causing any one of a number of positive effects, Or. Rev. Stat. § 415.501(9)(a); *and* (2) that there is no substantial likelihood of anticompetitive effects that outweigh the benefits of the transaction in increasing or maintaining services to underserved populations.  Or. Rev. Stat. § 415.501(9)(b).

Page 7 –    PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
            OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Even if the parties satisfy both of those requirements, however, they also must convince OHA

"*that the transaction meets the criteria adopted by the department by rule*" under subsection (2).

Or. Rev. Stat. § 415.501(9) (emphasis added).  Similar to preliminary review, then, the

comprehensive review criteria includes—as a necessary requirement—satisfying whatever criteria

the agency establishes.[1]

The second significant feature of the comprehensive review process is the role of a review

board of stakeholders who play a key, if not dispositive, role in the process.  Pursuant to subsection

(7), the legislature empowered OHA to "appoint a review board of stakeholders to conduct a

comprehensive review" of the proposed transaction.  Or. Rev. Stat. § 415.501(7).  For this

comprehensive review, the "community review" board of OHA's appointees engages in

factfinding concerning the proposed transaction, and then OHA may approve the transaction only

if it "determines that the transaction meets the criteria adopted by the department by rule" based on

the board's factfinding.  The law does not, however, provide OHA (or the board of its appointees)

with any guidance or standards for adopting the "criteria."  It also does not include any true

conflict-of-interest provisions applicable to the new board of OHA's appointees.

Regarding the fees and penalties, HB 2362 authorizes OHA to collect a "fee" that is

"proportionate to the size of the parties to the transaction, sufficient to reimburse the costs of

administering" HB 2362.  Or. Rev. Stat. § 415.512.  Those "fees" are deposited to the Oregon

Health Authority Fund.  Additionally, OHA may seek injunctive relief and "may impose a civil

penalty, as determined by the director, for a violation of" HB 2362, including the notice

---

[1] OHA clearly believes it may add to the legislative criteria, as OHA has done so.  *Compare* Or. Admin. R. 409-070-0060(6)(a)(B) (transaction may be approved on comprehensive review if no substantial likelihood that it would "[o]therwise be hazardous or prejudicial to consumers or the public"), *with* Or. Rev. Stat. § 415.501(9) (no reference to "hazardous or prejudicial").

Page 8 –     PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
             OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

requirement.  *Id.* §§ 415.501(22), 415.900.  OHA also may retain experts to assist with the

transaction review, and "designate the party or parties . . . that shall bear the reasonable and actual

cost of retaining the professionals."  *Id.* at § 415.501(14).

## III.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  The substantive law governing a claim or defense determines whether a fact is material.

*See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).  On cross-

motions for summary judgment, the court must consider each motion separately to determine

whether either party has met its burden, with the facts construed in the light most favorable to the

other.  *See* Fed. R. Civ. P. 56; *see also, e.g.*, *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132,

1136 (9th Cir. 2001).

## IV.  COMBINED ARGUMENT[2]

### A.    HB 2632 Violates the Due Process Clause

#### 1.    A Facial Vagueness Challenge Does Not Require Proof that a Statute Is Vague in All of Its Applications

OHA argues that, to pursue a facial vagueness challenge, OAHHS must establish that

HB 2362 is vague in every conceivable application.  (Def. Motion for Summary Judgment (ECF

No. 28) at 9-10.)  OHA's Due Process argument hinges entirely on application of that stringent

standard.  (*Id*. at 11-12.)  But that is not the current law in the Ninth Circuit.

---

[2] Plaintiff's Motion for Summary Judgment is separately stated above.  Given the relationship between the arguments against granting Defendants' motion for summary judgment and for granting Plaintiff's cross-motion for summary judgment, and the parties' agreed upon briefing schedule for addressing those arguments, Plaintiff offers a combined argument on both constitutional issues.

In the past, plaintiffs mounting a facial challenge for vagueness arguably had to "establish that no set of circumstances exists under which the statute would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). As courts have recognized, however, two recent Supreme Court decisions, *Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551, 192 L.Ed.2d 569 (2015); and *Sessions v. Dimaya*, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018), rejected that formulation. In *Johnson*, the Court rejected the notion that "a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." 576 U.S. at 602. In *Dimaya*, the Court reiterated that principle. *Dimaya*, 138 S. Ct. at 1214 n.3.

The Ninth Circuit addressed the legal standard for facial void-for-vagueness challenges in light of *Johnson* and *Dimaya* and squarely rejected Defendants' argument. *Guerrero v. Whitaker*, 908 F.3d 541 (9th Cir. 2018). As Judge Graber summarized:

> Applying the teachings of *Johnson* and *Dimaya* here, we conclude that we applied the wrong legal standard in *Alphonsus*. There, we held that the petitioner "must establish that no set of circumstances exists under which the statute would be valid." *Alphonsus*, 705 F.3d at 1042 (brackets omitted) (quoting *United States v. Salerno*, 481 U.S. 739, 745,107 S. Ct. 2095, 95 L.Ed.2d 697 (1987)). In a footnote, we observed that the "no set of circumstances" standard was subject to some doubt but that we would continue to apply that standard "until a majority of the Supreme Court directs otherwise." *Id*. at 1042 n.11 (internal quotation marks and brackets omitted). That day has come. *Johnson* and *Dimaya* expressly rejected the notion that a statutory provision survives a facial vagueness challenge merely because some conduct clearly falls within the statute's scope. *Johnson*, 135 S. Ct. at 2561; *Dimaya*, 138 S. Ct. at 1214 n.3.

*Id*. at 544.

Contrary to their argument, Defendants cannot defeat facial vagueness challenges by offering one or a few examples where a law might clearly apply, nor does Plaintiff's facial challenge fail if it cannot meet the "no set of circumstances" standard. *See Helicopters for*

*Agriculture v. Cty. of Napa*, 384 F.Supp.3d 1035, 1039-40 (N.D. Cal. 2019) ( "Our court of appeals lowered the burden for parties, like plaintiffs, that bring facial void for vagueness challenges as the government cannot defeat challenges by simply offering a single example where a law could be clearly applied."); *see also Williams v. Alameda Cty.*, No. 3:22-cv-01274-LB, 2022 WL 17169833, at * (N.D. Cal. Nov. 22, 2022) (citing *Guerrero* for the proposition that "the 'no set of circumstances' standard does not apply to facial-vagueness challenges").

Neither *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959 (9th Cir. 2003), nor *American Apparel & Footwear Ass'n, Inc. v. Allen*, 608 F. Supp. 3d 1005 (D. Or. 2022), alter that conclusion. In *Hotel & Motel Ass'n*, decided 15 years before *Guerrero*, the court recognized that the Supreme Court had "cast some doubt on the 'no set of circumstances' requirement" but ultimately applied that standard to uphold the statute against a facial vagueness challenge. *Id*. at 971-72. In *American Apparel*, the court discussed and addressed the standard governing a facial challenge based on federal preemption, an issue that the Ninth Circuit had not squarely considered in previous cases. 608 F. Supp. 3d at 1016-17. Regardless of the continued viability of the "no set of circumstances" test in the federal preemption context, the court's opinion in *Guerrero* clarifies that vagueness challenges to civil laws imposing penalties are no longer subject to that strict standard.

### 2.    The Void for Vagueness Doctrine

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253, 132 S. Ct. 2307, 183 L.Ed.2d 234 (2012). A statute can be impermissibly vague for either of two independent reasons. *Hill v. Colorado*, 530 U.S. 703, 732, 120 S. Ct. 2480, 147 L.Ed.2d 597 (2000). First, "regulated parties should know what is required of them so they

may act accordingly." *Fox Television*, 567 U.S. at 253.  Second, laws must provide proper

"precision and guidance" to ensure that "those enforcing the law do not act in an arbitrary or

discriminatory way."  *Id*.  (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S. Ct.

2294, 33 L.Ed.2d 222 (1972)).  When laws fail to "provide explicit standards for those who apply

them," they "impermissibly delegate[ ] basic policy matters . . . for resolution on an ad hoc and

subjective basis."  *Grayned*, 408 U.S. at 108-09.

Consistent with those requirements, in evaluating whether a law is unconstitutionally

vague, the court asks whether it "fails to provide a person of ordinary intelligence fair notice of

what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory

enforcement."  *Fox Television*, 567 U.S. at 254 (quoting *United States v. Williams*, 553 U.S. 285,

304, 128 S. Ct. 1830, 170 L.Ed.2d 650 (2008)).

The due process prohibition of vague laws is "applicable to civil as well as criminal

actions."  *Boutilier v. INS*, 387 U.S. 118, 123, 87 S. Ct. 1563, 18 L.Ed.2d 661 (1967); *see also Fox

Television*, 567 U.S. at 253 (noting that vagueness principles apply "[e]ven when speech is not at

issue").  As Justice Gorsuch recently emphasized:

> What degree of imprecision should this Court tolerate in a
> statute before declaring it unconstitutionally vague?  For its
> part, the government argues that where (as here) a person
> faces only civil, not criminal, consequences from a statute's
> operation, we should declare the law unconstitutional only if
> it is "unintelligible."  But in the criminal context this Court
> has generally insisted that the law must afford "ordinary
> people . . . fair notice of the conduct it punishes." *Johnson*,
> 576 U.S., at 601, 135 S. Ct., at 2557.  And I cannot see how
> the Due Process Clause might often require any less than that
> in the civil context either.  Fair notice of the law's demands,
> as we've seen, is "the first essential of due process."
> *Connally*, 269 U.S., at 391, 46 S. Ct. 126.  And as we've
> seen, too, the Constitution sought to preserve a common law
> tradition that usually aimed to ensure fair notice before any

> deprivation of life, liberty, or property could take place,
> whether under the banner of the criminal or the civil law.

*Dimaya*, 138 S. Ct. at 1228 (Gorsuch, J.) (concurring in part and concurring in the judgment).

**3.      HB 2362's Definition of "Health Care Entity" Is Unconstitutionally Vague**

HB 2362 is the quintessential example of a law that crosses the constitutional line.  The

lack of fair notice and impermissible vagueness in HB 2362 begins with the definition of "health

care entity," which governs who will be subject to the statute's requirements.  That definition has

three fundamental flaws.

First, by its terms, the purported definition of "health care entity" is not a definition at all,

but simply a list of what the phrase "health care entity" includes.  Or. Rev. Stat. § 415.500(4)(a).

Unlike the other definitions within the same section, all of which state what a term or phrase

"means," the definition of "health care entity" is entirely open-ended.  *See Langlotz v. Noelle*, 179

Or. App. 317, 322, 39 P.3d 271 (2002) ("When a statute 'does not say that the listed criteria are

exclusive, we can deem them to be exclusive only if exclusivity is necessary to give effect to the

intention of the legislature as expressed in the text and context of the statute.'")  As a result, even if

an entity could determine that it is not included in one of the listed examples, the agency could still

determine that the entity is a "health care entity" based on some other undefined criteria.

Second, the definition of "hospital system" is not a definition at all.  The statute simply

indicates that "health entity" includes a "hospital system, as defined by the authority by rule."

Or. Rev. Stat. § 415.500(4)(a)(B).  Defendants argue that Plaintiff is asserting the legal rights and

interests of nonparties because Plaintiff's members include "Oregon hospitals and *health systems*"

that "unequivocally qualify as 'health care entities' under HB 2362."  (Def. Motion for Summary

Judgment at 19 (emphasis added).)  Defendants then cite subsection (4)(a)(B), but fail to indicate

that the different and undefined words chosen by the legislature—"hospital system"—have any

Page 13 –      PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
                    OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

meaning in customary practice or statutory or common law.  In fact, the phrase "hospital system" does not appear anywhere else in the statute or administrative rules, other than in the agency's own created definition.

Third, Or. Rev. Stat. § 415.500(4)(a)(F) includes as health care entities "[a]ny other entity that has as a *primary function* the provision of health care items or services or that is a parent organization of, or is an entity *closely related* to, an entity that has as a primary function the provision of health care items or services."  (Emphasis added.)  That definition requires not only an assessment of "primary function"—an undefined phrase—but what qualifies as a "health care item or service."  It also requires an assessment of corporate relationships, including whether an entity is "closely related to" another entity with the primary function of providing health care items or services.  None of the key phrases are defined, leaving it to the parties and the agency to determine whether an entity comes within the scope of the statute without any ascertainable standard.

The residual clause raises a host of questions and problems.  Are manufacturers of health care drugs, supplies, and equipment, such as n-95 masks, bandages, or instant-read thermometers "health care entit[ies]" because their primary function is the provision of health care "items"?  What about a company that manufactures components essential for health care devices or equipment, but that have non-health care uses?  Is a company's "primary function" determined by the share of revenue derived from health care items, share of profits, or some other metric related to the customers it serves?  Is a software company that offers an application to help diabetics track blood sugar a "health care entity," or are those services not "health care" services because the software company is not a licensed provider?  And what does "closely related to" mean?  Would a key customer or supplier qualify?  Or does the entity have to have some ownership interest or stake

in the health care entity?  The list goes on.  Confusion regarding both the interpretation of the statute by entities and the enforcement of the statute by OHA is inevitable as to the most basic of its requirements.

As the Supreme Court has recognized in other contexts, a vague residual clause that leaves open the inclusion or exclusion of parties or conduct is particularly problematic.  In *Johnson*, for example, the Court sustained a vagueness challenge to the residual clause of the Armed Career Criminal Act, which defined "violent felony" to include any crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another."  576 U.S. at 594.  That clause was unconstitutionally vague because left "grave uncertainty" about how to estimate the risk posed by a crime and how much risk it would take for a crime to qualify as a violent felony. *Id*. at 597-98.  Likewise, here, the residual clause in the definition of "health care entity" leaves "grave uncertainty" about how to determine whether an entity is covered by the law, and what metrics, facts, or standards should be used to determine that fundamental question.

These are not marginal ambiguities either.  Rather, the key initial trigger for determining when an entity must provide notice of a transaction, and enter the approval process, is whether it qualifies as a "health care entity."  The statute, however, does not define a health care entity in a manner to gives a reasonable person fair notice, and delegates to OHA the unbounded discretion to determine that a wide range of entities qualify and therefore are subject to the law's requirements and prohibitions.

### 4.    HB 2362 Is Fatally Vague as to the Transactions Subject to Its Provisions

Similar to the definition of "health care entity," the statute's identification of the regulated conduct—the definition of "material change transaction"—is fatally vague.  Once one navigates the various cross references in the statute, a fundamental problem emerges:  What does or does not

constitute a "material change transaction" is left entirely up to the agency to determine. Put simply, the agency has complete and standardless discretion to define whether a contract, relationship, or other affiliation qualifies as a "transaction" or not, which leaves both parties and OHA adrift with no legislative guidance at all.

The plain terms of the statute compel that result. The key statutory definition is "transaction." Or. Rev. Stat. § 415.500(10). That term is defined to include not only well-understood transactions—such as mergers and acquisitions—but any "new contracts, new clinical affiliations and new contracting affiliations that will *eliminate or significantly reduce*, as defined by the authority by rule, *essential services*." Or. Rev. Stat. § 415.500(10)(c) (emphases added).

HB 2362 fails to define the key phrase "eliminate or significantly reduce." As explained later regarding OHA's subregulatory guidance and hypothetical, that phrase lacks any discernable content. HB 2362 also defines the phrase "essential services," to include "[s]ervices that are *essential* to achieve *health equity*." Or. Rev. Stat. § 415.500(2) (emphases added). As one court has observed, the "meaning of the word 'essential' varies considerably from one context to another." *Krause v. Titleserv, Inc.*, 402 F.3d 119, 126 (2d Cir. 2005) ("one might say it is 'essential' when driving a car to stay alert. This does not mean it is impossible to drive a car without being alert, but rather stresses the importance of staying alert. Similarly, one might ask an "essential" question. This does not mean the question had to be asked, but rather that it goes to the heart of the matter."). But even if one sets that problem aside, HB 2362 does not define "health equity" and, unlike the other terms or phrases in the statute, "health equity" has no common or ascertainable meaning. Instead, the meaning of "health equity" is entirely determined by the Oregon Health Policy Board and OHA. *See* Or. Rev. Stat. § 415.500(5) ("'Health equity' has the meaning prescribed by the Oregon Health Policy Board and adopted by the authority by rule.").

Stated another way, a transaction will qualify as a "transaction" if it significantly reduces something, but it is entirely up to the agency to define what that thing is, and it is similarly up to the agency what constitutes a "significant" reduction of that thing.

As a result of the statutory text and structure, whether a contract will qualify as a "material change transaction" depends entirely on undefined impacts that the agency, in its complete and sole discretion, will identify. The problems with this approach are evident. Are particular types of surgery or procedures essential to achieving health equity? If so, which ones? If a transaction will reduce or eliminate the availability of a procedure for everyone, is that inequitable? Are impacts judged on an overall net basis, or would the elimination of one service be sufficient to trigger the statute? All of those questions, and more, are left open by the statute without any guidance.

Moreover, a transaction is either subject to review or not based on the possibility that something may occur in the future, meaning there is no way for a party to a transaction to determine, ex ante, whether they may be subject to penalties for failing to seek approval. If the transaction is between a "health care entity in this state" and a "out-of-state entity," then a transaction is subject to review if it "may result in increases in the price of health care or limit access to health care services in this state." How can a party to a transaction determine whether the transaction "may result" in price increases or limitations to access? Is it based on the parties' pre-closing business plan? Or should the parties instead rely on their best guess about how the market will react to the transaction? Will an entity be subject to penalties if, several years after closing the transaction, it goes out of business due to increased competition? The statute does not answer, or even attempt to answer, these questions. As such, the statute serves as a blank check for OHA to impose penalties on parties to a transaction well after the transaction has closed based on its assessment of what the parties could have anticipated occurring post-closing.

That vagueness arises in other circumstances. HB 2362 defines "transactions" to include "[t]ransactions to form a new partnership, joint venture, accountable care organization, parent organization or management services organization, as prescribed by the authority by rule." Or. Rev. Stat. § 415.500(10)(e). Although the legislature did not write "[e]liminate or significantly reduce services" into that portion of the law, OHA wrote it into their rule. Or. Admin. R. 409-070-0010(1)(e)(A).

In this way, HB 2362 is not like other statutes that provide a general, but understandable, normative standard that is later refined by judicial or agency interpretations. Instead, it presents the illusion of standards, but once one navigates the actual text and cross-references the result is a statute that "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television*, 567 U.S. at 254. Neither parties nor the enforcing agency are given "a reasonable opportunity to know what is prohibited" to guide their actions. *Grayned*, 408 U.S. at 108.

5.    **The Absence of Legislatively Enacted Review Criteria Fails to Provide Notice and Encourages Arbitrary Enforcement**

As explained above, HB 2362's problems begin with the triggering definitions—who is subject to its requirements and which transactions are subject to its notice and review requirements. Once one gets past those requirements, however, the statute's criteria (or lack thereof) for determining whether conduct is or is not permissible confirms the statute's fatal vagueness. Approval or denial of a transaction (or the imposition of conditions on the transaction) requires wholly subjective judgments without legislative definitions, narrowing context, or settled legal meanings.

HB 2362 does not include sufficiently objective and defined criteria for OHA to apply when conducting a review of a proposed "material change transaction." With respect to

preliminary review of a proposed transaction, the cross-references to subsection (9) require

transactions to satisfy criteria that the agency alone establishes.  In addition, because the

transaction must comply with whatever rules the agency promulgates, and it provides no standard

or guidance for what those rules must require, the result is that a transaction may be approved or

not approved based on the agency's say-so.  The statutory text and structure leave both the parties

and the agency adrift as to what exactly the law requires.

The criteria for approval after comprehensive review suffer from a similar flaw.  Even if

parties navigate the other criteria for approval—including whether the transaction will "benefit the

public good and communities"—they still must show that "the transaction meets the criteria

adopted by the department by rule" under subsection (2)."  Or. Rev. Stat. § 415.501(9).  As a

result, parties might be able to satisfy every requirement that the legislature imposed, but the

transaction would *still* not be approved because it did not satisfy the agency's additional

requirements.  Including some specific requirements, but leaving a key requirement open-ended, is

not sufficient to provide adequate notice or prevent arbitrary enforcement.

Indeed, the relevant rule proves this point.  Oregon Administrative Rule 409-070-

0060(6)(a)(D) provides that a transaction is prohibited, and will not receive agency approval, if it

would "[o]therwise be hazardous or prejudicial to consumers or the public."  This open-ended and

hopelessly vague requirement is nowhere to be found in the statute, but as a result of the statutory

text, it must be met before a transaction can be deemed lawful.

### 6.    The OHA Regulations and Sub-Regulatory Guidance Do Not Solve the Vagueness Problem.

Throughout its Motion, OHA combines its discussion of the statute with OHA regulations

and guidance.  (Def. Motion for Summary Judgment at 6-7.)  But OHA's interpretations in

regulations or otherwise do not solve the statutory vagueness problem.  Due process requires, first

Page 19 –    PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
             OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

and foremost, an ascertainable *legislative* standard.  *Grayned*, 408 U.S. at 108 ("[A]n enactment is

void for vagueness if its prohibitions are not clearly defined.").  Otherwise, agency (or judicial)

interpretations are essentially ad hoc and arbitrary.  Nathan S. Chapman & Michael W.

McConnell, *Due Process as Separation of Powers*, 121 YALE L.J. 1672, 1722 (2012) (explaining

that "the Due Process Clause was originally understood to apply to legislative as well as executive

and judicial acts"); *U.S. v. L. Cohen Grocery Co.*, 255 U.S. 81, 86–87, 41 S. Ct. 298 (1921) (a

vague statute "amount[s] to a delegation by Congress of legislative power to courts and juries to

determine what acts should be held to be criminal and punishable").  As a threshold matter, then,

OHA's interpretations cannot fix the fundamental statutory vagueness problem.

Even if one examines the agency's interpretations, however, they prove the vagueness

point, rather than rebut it.  *See Grayned*, 408 U.S. at 110 (when assessing whether a statute is

vague, court looks to "the words of the ordinance itself, to the interpretations the court below has

given to analogous statutes, and, *perhaps to some degree*, to the interpretation of the statute given

by those charged with enforcing it") (emphasis added).  As an example, HB 2362 offers a vague

definition for "essential services" to include "[s]ervices that are *essential* to achieve *health equity*."

Or. Rev. Stat. § 415.500(2) (emphases added), but "health equity" is left to OHPB and the agency

to define.  Or. Rev. Stat. § 415.500(5) ("'Health equity' has the meaning prescribed by the Oregon

Health Policy Board and adopted by the authority by rule.").  OHA promulgated a rule effective

January 1, 2023, that defines "health equity" as:

> "a health system having and offering infrastructure, facilities,
> services, geographic coverage, affordability and all other
> relevant features, conditions and capabilities that will provide
> all people with the opportunity and reasonable expectation
> that they can reach their full health potential and well-being
> and are not disadvantaged by their race, ethnicity, language,
> disability, age, gender, gender identity, sexual orientation,

> social class, intersections among these communities or
> identities, or their socially determined circumstances."

Or. Admin. R. 409-070-0005(18).

OAHHS supports health equity.  The concern is that the definitions in this law and rule do not notify parties of the standard or criteria by which a transaction will be assessed.  OHA's rule states that "services that are essential to achieve health equity" means:

> (a) Any service directly related to the treatment of a chronic condition;
>
> (b) Pregnancy-related services;
>
> (c) Prevention services including non-clinical services; or
>
> (d) Health care system navigation and care coordination services."

*Id.* 409-070-0005(28).

Given the breadth of that definition, which includes a vast swath of health-care related services, OHA's definition demonstrates the complete absence of any statutory guidance.  As a result, regulated entities must guess whether the services they provide are essential under that definition.

In addition, OHA has attempted to resolve some of HB 2362's unconstitutional vagueness through the issuance of "sub-regulatory guidance."  OHA's sub-regulatory documents include, among others, hypothetical examples that exemplify the types of scenarios OHA would consider to constitute a transaction that "significantly reduces" what it believes are "essential services." Oregon Health Authority, *Defining Essential Services & Significant Reduction*, https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO-Essential-Services-and-Significant-Reduction-Guidance-FINAL.pdf (last accessed on July 14, 2023).

For example, one of the documents references a hypothetical "contracting affiliation," whereby an existing hospital and clinic seek to enter into a relationship, allowing some existing

clinic doctors to see patients on the hospital's (as opposed to the clinic's) campus.  In that example, OHA concludes that the services being provided are "essential."  *Id.*  OHA then analyzes eight criteria to determine whether the transaction will result in a reduction of essential services that is "significant."  *Id.*  There is no indication of where or how OHA came up with those criteria, but it considers them regardless.  *Id.*[3]  After viewing the hypothetical facts through the lens of its newly created criteria, OHA concludes the transaction would have numerous and clear benefits:

> (i) There would be no reduction of providers;
>
> (ii) There would be no reduction of providers serving new patients and individuals who are uninsured and underinsured;
>
> (iii) There would be no restrictions regarding rendering, discussing, or referring to any "essential services";
>
> (iv) There would be no decrease in the availability of "essential services";
>
> (v) There would be no increase in appointment wait times;
>
> (vi) There would be no increase in any barriers for community member seeking care, such as prior authorizations or required consultations before receiving essential services; and
>
> (vii) There would be no reduction of a specific type of care.

*Id.*

Despite those findings, however, OHA then concludes that the hypothetical affiliation actually would result in a "significant reduction" of essential services, making it subject to the extensive and costly review under HB 2362.  *Id.*  The only basis for that counterintuitive result is an increase of five miles in the median distance traveled by patients, from 10 to 15 miles, which is greater than an increase of one-third.  *Id.*

---

[3] OHA, also, recently included this administratively created one-third standard in a newly promulgated rule.  Or. Admin. R. 409-070-0010(3).

Page 22 –    PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
             OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This reveals the absurdity of arbitrary standards, such as the one-third standard, which is nowhere to be found in HB 2362.  Under a different hypothetical, one-third could mean less than a mile or more than 100 miles.  Is 5 miles meaningful enough to be "significant"?  What if (as one might expect) patients have access to various forms of public transportation when traveling to the hospital but not when they had traveled to the clinic?  And, as practical matter, how good is the data used to make this assessment and how much time and money will be spent by the providers and OHA to engage in that work?

That example addresses a specific scenario, but it underscores the general, and fundamental, problem with the statute.  Nothing in HB 2362 would give parties or the agency even a general normative standard against which to measure the lawfulness or unlawfulness of a transaction that increases patient travel time by one third, despite having clear and demonstrable benefits in every single other way.

Ultimately, OHA's inability to craft an understandable and predictable approach to when a transaction's impacts are permissible or impermissible demonstrates HB 2362's incurable vagueness.  OHA's struggle to develop rules and tests defining whether and when a transaction will result in prohibited impacts to the community is proof positive that HB 2362 contains no legislative standard to guide OHA or the regulated parties.

Plaintiff respects the time and effort that OHA has expended to try to make sense of HB 2362. OHA was given an impossible task.  The sheer volume and complexity of the subregulatory guidance reveals the work that the agency performed to do the legislature's job. Fundamental and difficult questions were left open in HB 2362, and the stakes are high.  HB 2362 threatens to deter or delay transactions that would benefit Oregon communities.

**B.      HB 2362 Violates the Non-Delegation Requirement of the Oregon Constitution**

1.      **Contrary to Defendants' Interpretation, the Non-Delegation Doctrine Is Not Limited to Adequate Procedural Safeguards**

Under the Oregon Constitution, the legislature may not enact laws without *both* (1) a full expression of legislative policy *and* (2) sufficient procedural safeguards to protect against arbitrary application. *City of Damascus v. Brown*, 266 Or. App. 416, 441, 337 P.3d 1019 (2014).  In *City of Damascus*, the Oregon Court of Appeals explained two lines of non-delegation cases and reiterated that both requirements must be met in order to ensure that the legislature has not improperly delegated its legislative authority.  *Id.* at 443.  After explaining that history, the court endorsed the following test:

> "We have thus succinctly articulated our task in reviewing for an unlawful delegation as follows:
>
> 'The test for determining whether a particular enactment is an unlawful delegation of legislative authority or a lawful delegation of factfinding power is whether the enactment is complete when it leaves the legislative halls. A legislative enactment is complete *if it contains a full expression of legislative policy and sufficient procedural safeguards to protect against arbitrary application*.'"

*Id.* (quoting *State v. Self*, 75 Or. App. 230, 236-37, 706 P.2d 975 (1985) (emphasis added)).

The court's discussion is consistent with the core principle of nondelegation as a constitutional limitation.  Properly understood, the nondelegation doctrine restricts the legislature from "confer[ring] upon any person, officer, agency, or tribunal the power to determine what the law shall be." *Van Winkle v. Fred Meyer, Inc*., 151 Or. 455, 462, 49 P.2d 1140, 1143 (1935); *see also Monaghan v. School Dist. No. 1, Clackamas County*, 211 Or. 360, 354, 315 P.2d 797 (1957) (separation of powers and responsibilities among the legislative, executive, and judicial branches,

is a concept engrained in our democratic form of government, and "'is admitted on all hands to be essential to the preservation of liberty'" (quoting Alexander Hamilton or James Madison, *The Federalist (No. 51)*, pp. 353, 354).  As interpreted by the United States Supreme Court, for example, the nondelegation doctrine requires the legislature to "lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Mistretta v. United States*, 488 U.S. 361, 372, 109 S. Ct. 647, 102 L. Ed. 2d 714 (1989) (quoting *J. W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409, 48 S. Ct. 348, 72 L. Ed. 624 (1928)); *see also Gundy v. United States*, 588 U.S. ___, ___, 139 S. Ct. 2116, 2123, 204 L. Ed. 2d 522 (2019) (plurality opinion) ("[t]he constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion.").  "The focus of controversy . . . has been whether the *degree* of generality contained in the authorization for exercise of executive or judicial powers in a particular field is so unacceptably high as to *amount* to a delegation of legislative powers."  *Mistretta*, 488 U.S. at 419 (Scalia, J. dissenting).  Answering that question "requires construing the challenged statute to figure out what task it delegates and what instructions it provides."  *Gundy*, 139 S. Ct. at 2123.

In its Motion, Defendants focus only on the second part of the test stated in the court's opinion in *City of Damascus*—the existence of adequate procedural safeguards.  (*See* Def. Motion for Summary Judgment at 14.)  Defendants do not, however, address whether HB 2362 includes a full expression of legislative policy to guide the exercise of delegated authority, nor do Defendants explain how HB 2362 complies with the principle of nondelegation more generally.  Instead, Defendants argue only that the nondelegation doctrine in Oregon does not contain that requirement or, presumably, any other substantive limitation.  (*Id*. at 14, n. 4.)

Page 25 –    PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
             OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' cramped interpretation is inconsistent with the proper understanding of nondelegation and its limits. The nondelegation doctrine ensures *ex ante* that the legislature adheres to its constitutional duty to exercise the legislative function. It is no answer to a nondelegation challenge that the legislature can relinquish its law-making function to the executive as long as there is an *ex post* opportunity to challenge the executive's decisions or exercise of that authority. And the court's discussion in *City of Damascus* (which is the case OHA relies on to articulate the nondelegation standard) directly contradicts Defendants' assertion that adequate procedural safeguards are alone sufficient to justify a legislative delegation. Indeed, in that case, the court expressly invalidated the law at issue on both grounds—failure to fully express policy and inadequate procedural safeguards. *See id.* at 448 ("Although HB 4029 provides criteria to determine *which* landowners are given the authority to change the city's boundary, those criteria do not provide any guidance to the eligible landowners on the exercise of *their* authority *to change* the boundary. It is the delegation of the latter authority that is impermissible.") (emphasis in original); *id.* at 450 ("We also conclude that HB 4029 fails under the second line of delegation cases because it delegates to self-interested private landowners the fact-finding function of determining their own eligibility under the law without any meaningful procedural safeguards.").

### 2. HB 2362 Does Not Include a Full Expression of Legislative Policy to Guide the Agency's Authority

Consistent with the above discussion, the first prong of the nondelegation doctrine focuses on whether the legislature has improperly delegated the power to "make law" by failing to fully express legislative policy to guide the exercise of any delegated authority. *City of Damascus*, 266 Or. App. at 442. In *City of Damascus*, for example, a law delegating to certain eligible property owners the power to change the city's boundary was an improper delegation because it was "a complete and unconstrained delegation of legislative authority" to change a city's boundaries, "left

Page 26 –    PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
             OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

to the whim of the eligible landowners" without any "criteria or expression of legislative policy as to how that delegated authority is to be exercised by the landowners." *Id*. at 448-49; *see also id*. at 448 (explaining that the challenged law did "not provide for governmental accountability of a withdrawal of property from the city").

All of the arguments above with respect to vagueness apply with equal force regarding the excessive delegation of lawmaking authority to OHA. *See Dimaya*, 138 S. Ct. at 1212 (describing vagueness doctrine as "a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not"). And an examination of what HB 2362 "actually does," *City of Damascus*, 266 Or App at 416, confirms that it suffers from the same fundamental flaw.

After requiring notice of any material change transaction, HB 2362 delegates to OHA the authority to approve or deny that transaction (or impose conditions on it). *See* Or. Rev. Stat. § 415.501(4)-(5). The legislature stated that the purpose of the preliminary review is "to determine if the transaction *has the potential* to have a negative impact on access to affordable health care in this state *and* meets the criteria in subsection (9) of this section." (Emphasis added.) That conjunctive requirement is incomplete because, as outlined above, the "criteria in subsection (9)" are the criteria that OHA adopts "under subsection (2)" of Oregon Revised Statute § 415.501. And *that* subsection contains no criteria, standard, or policy at all. It simply provides: "In accordance with subsection (1) of this section, the Oregon Health Authority shall adopt by rule criteria approved by the Oregon Health Policy Board for the consideration of requests by health care entities to engage in a material change transaction and procedures for the review of material change transactions under this section." Or. Rev. Stat. § 415.501(2).

Similar to the landowners in *City of Damascus*, the legislature did not provide OHA with a complete legislative policy to guide the approval or denial decision.  At the initial preliminary review stage, OHA is directed to approve the transaction (or approve the transaction with conditions) "based on criteria prescribed by the authority by rule."  Or. Rev. Stat. § 415.501(6).  The legislature provided non-exclusive, non-exhaustive factors for the agency to consider, but ultimately whether the transaction passes muster is determined solely by the agency's rules, not any complete legislative policy.  In effect, the preliminary determination whether a transaction is lawful or unlawful is entirely subject to the agency's whim.

HB 2362 also lacks any criteria or complete expression of legislative policy at the comprehensive review stage.  At that stage, the criteria for approval require a determination that "the transaction meets the criteria adopted by the department by rule" under subsection (2).  Or. Rev. Stat. § 415.501(9).  Thus, a necessary and indispensable condition of approval is that the transaction must meet whatever criteria the agency establishes.  And even if the transaction satisfies all of the conditions that the legislature has established for comprehensive approval, if OHA does not determine that the transaction meets its criteria (whatever those may be), the transaction will fail.  OHA's rule illustrates that dynamic precisely.  In addition to any legislative criteria, OHA requires a party to demonstrate that any material change transaction would not "[o]therwise be hazardous or prejudicial to consumers or the public."  Or. Admin. R. 409-070-0060(6)(a)(B).  The result of the legislature's unconstitutional delegation is an impossibly vague and discretionary standard that only the agency determines.

The breadth of HB 2362's impact further supports that conclusion.  When assessing the adequacy or completeness of the legislature's expression of policy, the scope of the delegation is relevant.  *See Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 475, 121 S. Ct.

903, 149 L. Ed. 2d 1 (2001) ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power . . . conferred.").  As one court has emphasized, "the ultimate judgment regarding the constitutionality of a delegation must be made not on the basis of the scope of the power alone, but on the basis of its scope plus the specificity of the standards governing its exercise. When the scope increases to immense proportions . . . the standards must be correspondingly more precise."  *Synar v. United States*, 626 F. Supp. 1374, 1386 (D.D.C. 1986). *See also Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 293 (4th Cir. 2018) (Gregory, C.J., concurring) ("When broad power is delegated with few or no constraints, the risk of an unconstitutional delegation is at its peak. . . .  Therefore, whether a delegation is unconstitutional depends on two factors—the amount of discretion and the scope of authority."), *vacated by Trump v. Int'l Refugee Assistance Project*, 585 U.S. ___, 138 S. Ct. 2710, 201 L.Ed.2d 1094 (2018).  In this situation, HB 2362 delegates to OHA the authority to regulate, and prohibit, transactions in a vast sector of the economy and in areas critically important to health and safety of Oregonians. Requiring adequate and complete expressions of legislative policy is even more important given the broad scope of OHA's authority.

The various cross-references make HB 2362 difficult to navigate and, in some respects, give the impression that the legislature outlined specific requirements to guide OHA's discretion. Prolixity and complexity, however, do not equal completeness.  At bottom, HB 2362 tells regulated parties that material change transactions will only be approved if they satisfy whatever criteria the agency establishes, without any guardrails to confine the agency's determination of those criteria.  OHA—not the legislature—is given the power to determine what the law will require.  That abdication of legislative authority is contrary to the Oregon Constitution.

**3.    HB 2362 Fails to Establish Sufficient Procedural Safeguards to Protect Against Arbitrary Action by the Private Boards**

In *Corvallis Lodge No. 1411 Loyal Ord. of Moose v. Oregon Liquor Control Comm'n*, the Oregon Court of Appeals noted that "the emphasis of the prohibited delegation doctrine has shifted from a concern for adequate legislative standards to a requirement that any delegation be accompanied by procedural safeguards to protect against arbitrariness." 67 Or. App. 15, 20, 677 P.2d 76 (1984). That is especially the case where, as here, in order to receive approval of a transaction, entities seeking approval will need to address private individuals "to whom authority has been delegated in the first instance to ascertain facts that ultimately may determine the success or failure of the application." *Id.* Under that legal framework, HB 2362 needed to include procedural safeguards to protect against arbitrary action by the relevant private boards. *See Damascus*, 266 Or. App. at 450 ("We also conclude that HB 4029 fails under the second line of delegation cases because it delegates to self-interested private landowners the fact-finding function of determining their own eligibility under the law without any meaningful procedural safeguards.").

HB 2362 delegates decision-making responsibilities to two different private "boards." First, it gives the OHPB the important task of making policy under HB 2362, by authorizing that board to statutorily define "health equity." Or. Rev. Stat. § 415.500(5). Second, it gives an OHA-chosen "community review board" important factfinding responsibilities in the comprehensive review process. Or. Rev. Stat. §§ 415.501(7), (11). Indeed, HB 2362 actually authorizes that community "review board of stakeholders to conduct [the] comprehensive review" of a proposed transaction. Or. Rev. Stat. § 415.501(7). To that end, under HB 2362, the community review board "may hold up to two public hearings to seek public input and otherwise engage the public before making a determination on the proposed transaction." Or. Rev. Stat. § 415.501(15). During

those hearings, the community review board (not OHA) is required to find and provide the public

with the following important facts:

- A summary of the proposed transaction;

- An explanation of the groups or individuals likely to be impacted by the transaction;

- Information about services currently provided by the health care entity,

  commitments by the health care entity to continue such services and any services

  that will be reduced or eliminated.

Or. Rev. Stat. § 415.501(15).

Once the community review board's comprehensive review of the proposed transaction is

complete, it is required to "make recommendations to the authority to approve the material change

transaction, disapprove the material change transaction or approve the material change transaction

subject to conditions, based on subsection (9) of this section and the criteria adopted by rule under

subsection (2) of this section."  Or. Rev. Stat. § 415.501(18).  OHA, then, has the authority only to

"issue a final order setting forth the authority's findings and rationale for *adopting or modifying*

the recommendations of the review board."  *Id.* (emphasis added).  The statute does not, however,

contemplate that OHA may outright reject the community review board's recommendation or

engage in factfinding of any sort on its own.[4]  Therefore, the community review board has "been

delegated in the first instance to ascertain facts that ultimately may determine the success or failure

of the application," which required the legislature to include sufficient procedural safeguards in

HB 2362.  *Corvallis*, 67 Or. App. at 20.

---

[4] Although OHA, in this litigation, asserts it may outright reject the private board's
recommendations by interpreting "modify" to include a complete rejection, there is nothing in the
statute that would allow OAHHS's members to make that analytical leap on their own—again,
evidencing the overly vague nature of HB 2362.

HB 2362 does not, however, include *sufficient* procedural safeguards applicable to the community review board.  There are two potential conflict-of-interest provisions applicable under HB 2362, none of which provides sufficient safeguards for that board.  First, the law includes a conflict-of-interest provision applicable to "an officer or employee of OHA," but that would not include members of the community review board.  Or. Rev. Stat. § 415.505.  Second, HB 2362 provides that a "member of a review board shall file a notice of conflict of interest and the notice shall be made public."  That, however, is insufficient to provide any meaningful safeguards, because it requires only the "filing" of a "notice" of conflict-of-interest.  The statute does not define what "conflict of interest" means under HB 2362 or what further action needs to be taken once notice is provided.  Both the *Corvallis* and *Damascus* cases support the conclusion that those purported safeguards are insufficient.

*Medford Firefighters Assn. v. City of Medford* is inapposite on this point.  40 Or. App. 519, 525-26 (1979).  In that case, the "procedural concern" involved a private arbitrator, but the court found there was no risk an arbitrator would have a personal interest in the decision at issue, and the legislature had provided specific factors for the arbitrator to consider when deciding a case.  *Id.*  Here, similar restrictions do not exist.  Unlike the arbitrator in *Medford*, a risk exists that members of the community review board will have a personal interest in the transactions they are reviewing.  To that end, HB 2362 provides that OHA decides who sits on the board, *every time there is a new proposed transaction for review*.  Or. Rev. Stat. § 415.501(7)(a).  Each time OHA does that, the board "must consist of members of the affected community, consumer advocates, and health care experts," all of whom very likely will have a personal interest in the proposed transaction (as compared to a neutral arbitrator).  Or. Rev. Stat. § 415.501(11)(a).  Accordingly, because of those

differences, *Medford* is distinguishable and does not support the conclusion that HB 2362 provides sufficient procedural safeguards required by the nondelegation doctrine.

### 4. The Possibility of APA Review Does Not Immunize the Legislative Delegation

The availability of judicial review under the Oregon Administrative Procedures Act (the "APA") also does not somehow authorize the legislature to delegate its constitutional duties here. Three reasons support that conclusion.

First, in *Corvallis*, the Oregon Court of Appeals invalidated an administrative rule under the nondelegation doctrine because it did not include sufficient procedural safeguards. *See* 67 Or. App. at 22 ("We conclude that OAR 845–08–045 constitutes an invalid delegation of governmental authority to private individuals, because it fails to provide procedural safeguards to protect against the unaccountable exercise of governmental power delegated to the Class A licensees."). Although the plaintiff in that case had the opportunity to, and did, pursue APA review of the relevant rule, the ability to do so did not solve the constitutional problem. Accordingly, the existence of APA review is not a substitute for Oregon's constitutional requirement "that any [legislative] delegation be accompanied by procedural safeguards to protect against arbitrariness." *Id.* at 20.

Second, allowing APA review to replace more robust legislative safeguards makes no sense in this context. The APA ensures that impacted individuals may obtain judicial review of actions by state *administrative agencies*. *See Eastern Oregon Mining Assoc. v. Dept. of Envtl. Quality*, 360 Or. 10, 15-16 (2016) (describing this concept); Or. Rev. Stat. § 183.480(2) ("Judicial review of final orders of agencies shall be solely as provided by" the APA.). In this case, however, OAHHS ultimately seeks to challenge the *legislature's* failure to enact HB 2362 with constitutionally sufficient procedural safeguards. The ability of OAHHS's members to also

challenge specific actions of OHA under the APA does not relieve the legislature from performing its constitutional duties.

Third, APA review would not remedy the procedural risks presented by HB 2362:  whether members of the OHPB or community review board will have a conflict of interest requiring some sort of remedial action.  Under the APA, judicial review is limited to whether OHA has (1) erroneously interpreted a provision of law; (2) acted outside the range of discretion delegated to the agency by law; (3) acted inconsistent with an agency rule, an officially stated agency position, or a prior agency practice; or (4) acted otherwise in violation of a constitutional or statutory provision.  Or. Rev. Stat. § 183.482(8); *id.* at § 183.484(5).  None of those avenues for review, however, provides sufficient safeguards against conflicts by OHPB or the community review board.  Existence of those conflicts would not qualify as an APA-reviewable erroneous interpretation of law, acting outside the range of discretionary authority, or acting inconsistent with OHA rules and policy.  The potential availability of APA review in the future does not displace the need for additional safeguards now, such as a conflict-of-interest provision in the statute.  *See Corvallis*, 67 Or. App. at 22 (holding, in a case under the APA, that the administrative rule being challenged nonetheless needed additional procedural safeguards to pass constitutional muster).  Thus, APA judicial review is insufficient to save the statute under the nondelegation doctrine.

## C.    The Court Should Retain Jurisdiction over Plaintiff's State Law Claims

Economy, convenience, fairness, and comity support retaining OAHHS's state-law claim.  As an initial matter, OAHHS's nondelegation claim mirrors its federal counterparts.  For example, the standards for the nondelegation doctrine under Oregon law are almost identical to and rely on those under federal law.  *See Corvallis*, 67 Or. App. at 19 (identifying *General Electric Co. v.*

*Wahle*, as the first Oregon nondelegation case); *General Electric Co. v. Wahle*, 207 Or. 302, 330-31 (1956) (relying on federal caselaw for nondelegation standards).

Dismissing OAHHS's state law claim would also require the parties to start from the beginning in a case that has completely overlapping factual and legal issues and has been active for over six months.  In this case, OAHHS's claims—both federal and state—seek relief from the legislature's decision to enact an unconstitutionally vague law.  Requiring the parties to start that litigation over again, litigation that involves entirely the same parties and facts, which are wholly undisputed, and very similar law, would not promote economy, convenience, or fairness.  Instead, it would require the parties in this suit to duplicate all their efforts in the litigation to this date, only in a different venue.  That is not efficient.  Accordingly, this Court should retain jurisdiction over OAHHS's state law claims and resolve the issues that the parties already have spent significant resources preparing for resolution from this Court.

## V.  CONCLUSION

OAHHS respectfully requests that the Court grant Plaintiff's Cross-Motion for Summary Judgment, deny Defendants' Motion for Summary Judgment, and declare that HB 2362 violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as the nondelegation doctrine under the Oregon Constitution.

DATED:    July 14, 2023                      STOEL RIVES LLP


                                             s/ Brad S. Daniels
                                             ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                             BRAD S. DANIELS, OSB No. 025178
                                             brad.daniels@stoel.com
                                             NATHAN R. MORALES, OSB No. 145763
                                             nathan.morales@stoel.com

                                             Attorneys for Plaintiff