# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OREGON ASSOCIATION OF HOSPITALS AND HEALTH SYSTEMS**, | Case No. 3:22-cv-1486-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **STATE OF OREGON, OREGON HEALTH AUTHORITY,** and **DR. SEJAL HATHI,** in her official capacity as Director of Oregon Health Authority, | |
| Defendants. | |

Brad S. Daniels and Nathan R. Morales, STOEL RIVES LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Of Attorneys for Plaintiff.

Sara D. Van Loh and YoungWoo Joh, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

The Oregon Association of Hospitals and Health Systems (OAHHS) brings this lawsuit against the State of Oregon (State); the Oregon Health Authority (OHA), Oregon's licensing agency for health care facilities; and Dr. Sejal Hathi, M.D., M.B.A., in her official capacity as Director of the OHA (collectively, Defendants). In its First Amended Complaint (FAC), OAHHS asserts two facial challenges to Oregon House Bill (HB) 2362 (2021) (codified at OR. REV. STAT.

(ORS) § 415.500-.900), which created Oregon's Health Care Market Oversight (HCMO) program. First, OAHHS asserts that HB 2362 is unconstitutionally vague, in violation of the Due Process Clause of the Fourteenth Amendment (First Claim). Second, OAHHS contends that HB 2362 impermissibly delegates legislative powers to the OHA, a state executive agency, in violation of the nondelegation principles found in article I, section 21; article III, section 1; and article IV, section 1(1) of the Oregon Constitution (Second Claim).

OAHHS describes itself as a statewide nonprofit trade association representing Oregon hospitals and health systems. FAC ¶ 7. Its members include hospitals and health systems that are subject to the requirements of HB 2362 and have engaged or will engage in transactions that likely will trigger the requirements of HB 2362. *Id*. ¶ 8. OAHHS seeks declaratory and injunctive relief.

Before the Court are the parties' cross-motions for summary judgment. In OAHHS's motion, OAHHS seeks summary judgment on both claims. In Defendants' motion, Defendants begin by requesting summary judgment against OAHHS's First Claim, for violation of the Due Process Clause of the Fourteenth Amendment. Defendants then argue that if they prevail against OAHHS's First Claim, the Court should decline to exercise supplemental jurisdiction over OAHHS's Second Claim, which invokes only the Oregon Constitution. In the alternative, Defendants move for summary judgment on the merits against OAHHS's Second Claim. For the reasons explained below, the Court grants Defendants' motion for summary judgment against OAHHS's First Claim, declines to exercise supplemental jurisdiction over OAHHS's Second Claim, and denies OAHHS's motion for summary judgment.

**STANDARDS**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Then, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in

such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND[1]

According to Defendants, the Oregon Legislature passed HB 2362 in response to the consolidation of health care providers in recent years and concerns about increasing health care costs and decreasing services and quality of care. Defendants explain that the Oregon Legislature's purpose in enacting HB 2362 was to ensure that certain qualifying transactions involving health care entities "would not continue to negatively impact access to health care, quality of patient care, costs for consumers and payers, or health equity." The HCMO program requires certain parties that meet (or are expected to meet) minimum revenue thresholds to notify OHA and submit to a regulatory process for approval before engaging in certain kinds of business transactions (*e.g.*, mergers and acquisitions, affiliations, and certain contractual arrangements) that involve health care entities or that otherwise significantly may affect the provision of certain health care services. HB 2362 sets forth the HCMO program's requirements and procedures, and OHA has promulgated administrative rules under the statute and has issued sub-regulatory guidance documents as it has implemented the program. The HCMO program launched in March 2022.[2] As of December 2023, OHA had undertaken 17 reviews of qualifying transactions, with nine of those transactions approved and five still in progress.[3]

---

[1] This section is comprised of undisputed facts taken from the parties' motions for summary judgment, the attachments filed in support of those motions, and such other materials of which the Court can take judicial notice.

[2] OHA, Health Care Market Oversight 2023 Annual Report, at 2 (Jan. 4, 2024), https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO%202023%20Annual%20Report.pdf.

[3] *Id.* at 5. Of the nine approved transactions, five were approved without conditions, and four were approved with conditions. *Id.* Also as of December 2023, OHA had undertaken 15

## A. Operation of HB 2362

HB 2362 requires a covered "health care entity" to provide OHA with notice before engaging in a covered "material change transaction" and prohibits that entity from engaging in a covered transaction until the transaction has been reviewed and approved by OHA. The review and approval of covered transactions is governed by criteria that are set forth within the statute and supplemented by administrative rules. Below, the Court reviews the statutory and regulatory provisions that govern which entities are covered by the HCMO program; the types of transactions for which a covered entity must provide OHA with formal notice; other aspects of OHA's decision-making process, including the criteria for approval of a transaction; and the equitable relief and civil penalties available to OHA to respond to violations of HB 2362. The Court also briefly discusses OHA's sub-regulatory guidance on the HCMO program and the availability of pre-notice inquiry about the application of the law to prospective transactions.

### 1. Covered Entities

HB 2362 defines "health care entities"—the entities subject to the HCMO program—by listing six categories of covered entities.[4] Several of these categories are clarified in cross-referenced provisions of the ORS, by Oregon Administrative Rule (OAR), or both.

Under ORS § 415.500(4)(a), "health care entity" includes:

> (A) An individual health professional licensed or certified in this state;

---

preliminary reviews, two comprehensive reviews, and two follow-up reviews. *Id.* "Preliminary review" and "comprehensive review" are explained below. Regarding "follow-up review," the law requires OHA periodically to conduct post-transaction reviews to determine the effects of an approved transaction that has been completed and whether the parties to the transaction have complied with the conditions placed on the transaction, if any. ORS § 415.501(19).

[4] The statute also exempts from the definition of "health care entity" certain long-term care facilities and residential facilities and homes. *See* ORS § 415.500(4)(b).

(B) A hospital, as defined in ORS 442.015,[5] or hospital system, as defined by the authority by rule;[6]

(C) A carrier, as defined in ORS 743B.005,[7] that offers a health benefit plan in this state;

(D) A Medicare Advantage plan;

(E) A coordinated care organization or a prepaid managed care health services organization, as both terms are defined [by statute]; and

(F) Any other entity that has as a primary function the provision of health care items or services or that is a parent organization of, or is an entity closely related to, an entity that has as a primary function the provision of health care items or services.

**2.  Covered Transactions**

HB 2362 governs review and approval of specified transactions of covered heath care entities, including qualifying mergers, acquisitions, and affiliations. The law circumscribes the scope of covered transactions—called "material change transactions"—by defining both

---

[5] ORS § 442.015(15) defines "hospital" as: either (1) "A facility with an organized medical staff and a permanent building that is capable of providing 24-hour inpatient care to two or more individuals who have an illness or injury and that provides at least the following health services: (A) Medical; (B) Nursing; (C) Laboratory; (D) Pharmacy; and (E) Dietary," or (2) "A special inpatient care facility as that term is defined by the authority by rule."

[6] OAR 409-70-005(20) defines "hospital system" as:

(a) A parent corporation of one or more hospitals and any entity affiliated with the parent through ownership, governance, control, or membership; or

(b) A hospital and any entity affiliated with the hospital through ownership, governance, control, or membership.

[7] ORS § 743B.005(5) defines "carrier" to mean "any person who provides health benefit plans in [Oregon]," including "[a]ny . . . person or corporation responsible for the payment of benefits or provision of services."

"transaction" and the "material[ity]" standard. OHA's regulations also define several key terms found within those definitions.

### a. "Transaction"

ORS § 415.500(10) defines "transaction" as:

> (a) A merger of a health care entity with another entity;
>
> (b) An acquisition of one or more health care entities by another entity;
>
> (c) New contracts, new clinical affiliations and new contracting affiliations that will eliminate or *significantly reduce*, as defined by the authority by rule, *essential services*;
>
> (d) A corporate affiliation involving at least one health care entity; or
>
> (e) Transactions to form a new partnership, joint venture, accountable care organization, parent organization or management services organization, as prescribed by the authority by rule.[8]

(emphases added). As relevant to paragraph (c), the terms "essential services" and "significantly reduce" are defined by statute and rule.

Under ORS § 415.500(2), "essential services" means: (a) services that are on a prioritized list of health services developed by Oregon's Health Evidence Review Commission and funded by the Legislative Assembly;[9] and (b) "[s]ervices that are essential to achieve health equity." As defined by rule, "services that are essential to achieve health equity" encompasses four categories of services: "(a) Any service directly related to the treatment of a chronic condition;

---

[8] The law also categorically excludes and exempts certain transactions from the definition of "material change transaction," *See* ORS § 415.500(6)(b).

[9] ORS § 414.690 directs the Health Evidence Review Commission, which decides which services to cover on the Oregon Health Plan, to develop and maintain "a list of health services ranked by priority . . . representing the comparative benefits of each service to the population served." *See Health Evidence Review Commission*, Oregon.gov, https://www.oregon.gov/oha/hpa/dsi-herc.

(b) Pregnancy-related services; (c) Prevention services including non-clinical services; or

(d) Health care system navigation and care coordination services." OAR 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(28). Also

as defined by rule, a "significant reduction of services" occurs when a transaction will result in

one-third or more of eight listed harms involving access to health care services and the provision

or availability of those services. *See* OAR 409-070-0010(3).[10]

---

[10] OAR 409-070-0010(3) provides:

> A significant reduction of services occurs when the transaction will result in a change of one-third or more of any of the following:
>
> (a) An increase in time or distance for community members to access essential services, particularly for historically or currently underserved populations or community members using public transportation;
>
> (b) A reduction in the number of providers, including the number of culturally competent providers, health care interpreters, or traditional healthcare workers, or a reduction in the number of clinical experiences or training opportunities for individuals enrolled in a professional clinical education program;
>
> (c) A reduction in the number of providers serving new patients, providers serving individuals who are uninsured, or providers serving individuals who are underinsured;
>
> (d) Any restrictions on providers regarding rendering, discussing, or referring for any essential services;
>
> (e) A decrease in the availability of essential services or the range of available essential services;
>
> (f) An increase in appointment wait times for essential services;
>
> (g) An increase in any barriers for community members seeking care, such as new prior authorization processes or required consultations before receiving essential services; or
>
> (h) A reduction in the availability of any specific type of care such as primary care, behavioral health care, oral health care, specialty care, pregnancy care, inpatient care, outpatient care, or emergent care as relates to the provision of essential services.

### b.  "Materiality"

Under ORS § 415.500(6), a "transaction" qualifies as a "material change transaction" based on specific financial thresholds involving a participating health care entity's prior or projected revenue. ORS § 415.500(6)(a) provides in part:

> "Material change transaction" means:
>
> (A) A transaction in which at least one party had average revenue of $25 million or more in the preceding three fiscal years and another party:
>
>> (i) Had an average revenue of at least $10 million in the preceding three fiscal years; or
>>
>> (ii) In the case of a new entity, is projected to have at least $10 million in revenue in the first full year of operation at normal levels of utilization or operation as prescribed by the authority by rule.

The law adds a criterion for a transaction involving "a health care entity in [Oregon] and an out-of-state entity" to qualify as a "material change transaction": the transaction will be covered by the statute only if it also "may [1] result in increases in the price of heath care or [2] limit access to health care services in [Oregon]." ORS § 415.500(6)(a)(B).

### 3.  Criteria for Approval

The core provision of HB 2362, codified at ORS § 415.501, sets forth procedures and requirements for covered health care entities to provide notice to OHA of a material change transaction and for OHA's review and approval of that transaction.[11] A transaction may be approved either after a "preliminary review" (under ORS § 415.501(6)), or a "comprehensive

---

[11] When a material change transaction involves the sale, merger, or acquisition of a domestic health insurer, the notice must be submitted to the Department of Consumer and Business Services, which then conveys the notice to OHA for review. Although OHA undertakes a review of the transaction, the Department of Consumer and Business Services makes the final determination. *See* ORS § 415.501(3).

review" (under ORS § 415.501(9)). If OHA decides not to approve a transaction after its preliminary review, it must conduct a comprehensive review. *See* ORS § 415.501(7); OAR 409-070-0055(3), -0060(1).

Various criteria govern: (1) approval of a under a preliminary review; and (2) approval of a transaction under a comprehensive review. ORS § 415.501(6), (8)(c), (9). The law itself supplies some of those criteria but also directs OHA to promulgate additional criteria consistent with the purposes of ORS § 415.501: "to promote the public interest and to advance the goals set forth in ORS 414.018 and the goals of the Oregon Integrated and Coordinated Health Care Delivery system described in ORS 414.570." ORS § 415.501(1), (2). The "goals set forth" in the cross-referenced statutory provisions include, among other things, ensuring "universal access to an adequate level of high quality health care at an affordable cost" (under ORS § 414.018(1)); "improving health, increasing the quality, reliability, availability[,] and continuity of care and reducing the cost of care" (under ORS § 414.018(3)); and reducing medical cost inflation and eliminating health disparities (under ORS § 414.570(1), (3)(b)). *See also* OAR 409-070-0000(2), (3) (explaining the purpose of the implementing regulations and setting forth specific goals OHA seeks to achieve when reviewing proposed material change transactions).

Based on these purposes and cross-referenced statutory directives, OHA's implementing regulations set forth the criteria that govern whether approval of a transaction will follow a preliminary review of that transaction. Those regulations, which incorporate the review criteria that OHA is required to consider, provide that OHA must approve a material change transaction if OHA determines that the transaction meets one or more of the following criteria[12]:

---

[12] If the material change transaction involves a domestic health insurer and OHA determines that the transaction meets one or more of the criteria, OHA must recommend to the

    (a) The material change transaction is in the interest of consumers and is urgently necessary to maintain the solvency of an entity involved in the transaction;

    (b) The material change transaction is unlikely to substantially reduce access to affordable health care in Oregon;

    (c) The material change transaction is likely to meet the criteria [that govern a comprehensive review of a notice of a material change transaction, as] set forth in OAR 409-070-0060;

    (d) The material change transaction is not likely to substantially alter the delivery of health care in Oregon; or

    (e) Comprehensive review of the material change transaction is not warranted given the size and effects of the transaction.

OAR 409-070-0055(2). Of these five criteria, the first three restate the criteria set forth in the statute. *See* ORS § 415.501(6)(a), (b).

OHA's implementing regulations also set forth the criteria that govern whether approval of a transaction will follow a *comprehensive* review of that transaction. The regulations require OHA to approve a material change transaction if the transaction "satisfies (a) below and also satisfies either (b) or (c)"[13]:

    (a) There is no substantial likelihood that the transaction would:

        (A) Have material anticompetitive effects in the region (such as significantly increased market concentration among providers when contracting with payers, carriers, or coordinated care organizations, or among carriers when establishing health benefit premiums that is likely to increase costs for consumers) not outweighed by benefits in

---

Department of Consumer and Business Services that the transaction be approved. *See* OAR 409-070-0055(2); ORS § 415.501(3).

    [13] If the material change transaction involves a domestic health insurer and OHA determines that the transaction similarly satisfies these criteria, OHA must recommend to the Department of Consumer and Business Services that the transaction be approved. *See* OAR 409-070-0060(6); ORS § 415.501(3).

increasing or maintaining services to underserved
populations;

(B) Be contrary to law;

(C) Jeopardize the financial stability of a health care
entity involved in the transaction; or

(D) Otherwise be hazardous or prejudicial to consumers
or the public.

(b) The transaction will benefit the public good and
communities by:

(A) Reducing the growth in patient costs in accordance with
the health care cost growth targets established under ORS
442.386[14] or maintain a rate of cost growth that exceeds the target
that the entity demonstrates is in the best interest of the public;

(B) Increasing access to services in medically
underserved areas; or

(C) Rectifying historical and contemporary factors
contributing to a lack of health equity or access to services.

(c) The transaction will improve health outcomes for residents
of [Oregon].

OAR 409-070-0060(6). Of the above provisions, paragraphs (b) and (c) are from the statute

(ORS § 415.501(9)(a)(A), (B)), and paragraph (a)(A) mirrors the statute but adds examples of

"material anticompetitive effects." *See* ORS § 415.501(9)(b). Whether under a preliminary

review or a comprehensive review, OHA must analyze information provided in a notice of a

---

[14] ORS § 442.386 contains the operative provisions establishing and governing Oregon's
Health Care Cost Target Growth program, which "establish[es] a health care cost growth target"
that must "[p]romote a predictable and sustainable rate of growth." ORS § 442.386(2), (3)(a).

material change transaction under standards published on OHA's website and that must be, among other things, "clear, fair, predictable, and consistent." OAR 409-070-0045(9), (9)(a).[15]

### 4. Post-Review Procedures

OHA's regulations provide that after its comprehensive review, OHA must issue a proposed order, along with "proposed findings of fact and conclusion of law." OAR 409-070-0060(4). OHA must then give the parties and the public "a reasonable opportunity to make written comments to the proposed findings and conclusions and the proposed order." *Id.* OHA must consider those comments, which must be made available to the public, and then issue a final order that sets forth OHA's final findings and conclusions. *Id.*; OAR 409-070-0060(5). A party to the proposed transaction may contest a final order by way of a contested case hearing. OAR 409-070-0060(5); *see also* OAR 409-070-0075 (governing procedures for contested case hearings). The resulting decision is then subject to judicial review by the Oregon Court of Appeals. OAR 409-070-0075(11).

---

[15] OAR 409-070-0045(9) provides:

> [OHA's] review of the information provided in a notice of material change will be analyzed using the Analytic Framework, published on the [HCMO] Program website, with standards that:
>
> (a) Are clear, fair, predictable, and consistent;
>
> (b) Use measures of quality and access that can be meaningfully compared to current and past performance across Oregon and, if available, in other states; and
>
> (c) Include equity analyses that stratify cost, quality, and access data by the characteristics specified in the definition of health equity to the greatest extent allowable by data availability.

*See also* OHA, *Health Care Market Oversight Analytic Framework* (Oct. 2022), https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/OHA-HCMO-Analytic-Framework-FINAL.pdf.

**5. Equitable Relief and Penalties**

HB 2362 provides OHA with two types of remedies for covered entities' violations of the law. First, "[w]henever it appears to the Director of [OHA] that any person has committed or is about to commit a violation" of the law's core provisions or a related administrative rule, the Director may seek an appropriate injunction and "such other equitable relief as the nature of the case and the interest of the public may require." ORS § 415.501(22). Second, HB 2362 authorizes the Director to impose civil penalties for such violations, up to $10,000 for each offense. ORS § 415.900(1).

**B. Guidance Documents**

OHA maintains a publicly available website that provides information and access to documents detailing the parameters and procedures of HB 2362.[16] One such document, titled "Entities Subject to Review," describes "the types of entities that may be subject to review when materiality and transaction criteria are met."[17] That document sets forth examples of entities that may be subject to review, and explains why that is so—*e.g.*, because the entity's primary function is the provision of health care; the entity is closely related to another entity that provides health care; or because the entity has control over another entity that provides health care.[18] In addition, OHA has issued a document titled "Defining Essential Services & Significant Reduction" that outlines a two-part test and provides examples to guide health care entities in

---

[16] OHA, *Health Care Market Oversight Rules and Guidance*, https://www.oregon.gov/oha/hpa/hp/pages/hcmo-rules.aspx.

[17] OHA, *Entities Subject to Review* (Oct. 2022), https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO-Entities-Subject-to-Review.pdf.

[18] *See* ORS § 415.500(4)(a)(F) (residual provision in definition of "health care entity"); OAR 409-070-0005(16)(f)-(g) (further defining and narrowing residual provision by rule).

determining whether a prospective transaction will "significantly reduce" "essential services" and thus may qualify as a covered "transaction" under ORS § 415.500(10)(c).[19] Other guidance documents made available on OHA's webpage include, among others: "Health Care Market Oversight Analytic Framework"; "Safe Harbor and Transactions Not Subject to Review"; "Are Changes in Ownership of Assets Changes in Control?"; and "Criteria for Comprehensive Review of Material Change Transactions."

## C.  Pre-Notice Review

Under OHA's implementing regulations, a party to a proposed transaction may, before submitting a formal notice of the transaction, submit a written application to OHA "requesting a determination whether such transaction is a covered transaction pursuant to [OHA's] rules." OAR 409-070-0042(1). No fee is required for such an application. OAR 409-070-0042(4). OHA must notify the applicant in writing of OHA's determination within 30 days of receiving the application. OAR 409-070-0042(1). The regulations also encourage all parties to a material change transaction for which a formal notice will be filed to contact OHA to arrange for a "pre-filing conference." OAR 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(2).[20]

---

[19] OHA, *Defining Essential Services & Significant Reduction* (Jan. 31, 2022), https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO-Essential-Services-and-Significant-Reduction-Guidance-FINAL.pdf.

[20] The rules also provide that, if OHA decides to conduct a comprehensive review, the agency must offer a "comprehensive review conference." OAR 409-070-0045(2). The rules further provide that "[t]he pre-filing conference or comprehensive review conference shall preview the transaction . . . including timing, the use of outside experts, the potential involvement of a community review board . . . , and other relevant issues." *Id.*

**DISCUSSION**

**A.  Plaintiff's First Claim: Vagueness**

As its first claim, OAHHS brings a facial challenge to HB 2362, asserting that the law is void for vagueness under the Due Process Clause of the Fourteenth Amendment. OAHHS contends that HB 2362 violates the federal void-for-vagueness doctrine because the law fails to provide fair notice and because it encourages arbitrary enforcement. Defendants' position is that OAHHS has not shown that HB 2362 is unconstitutionally vague under the applicable standard.

According to Defendants, for a plaintiff to prevail on a *facial* challenge to a law on void-for-vagueness grounds, a plaintiff must demonstrate that the law is unconstitutional in every conceivable application, and OAHHS has not done so here. Defendants add that even under a stricter vagueness standard—*i.e.*, one less permissive of vagueness, and thereby easing a challenger's burden—OAHHS would still fail to meet that lesser burden. OAHHS replies that the "every conceivable application" standard that Defendants invoke no longer applies and argues for a stricter standard (a lesser burden for OAHHS). OAHHS further argues that even under the more burdensome standard that would require a challenger to show that a law is unconstitutional in "every conceivable application," HB 2362 is impermissibly vague. For the reasons stated below, the Court agrees with Defendants that, regardless of the specific standard that governs facial challenges generally, OAHHS has not met its burden for a facial vagueness challenge to HB 2362.

**1.  Facial Challenges Generally**

**a.  Background Principles**

"A 'facial' challenge . . . means a claim that the law is 'invalid *in toto*—and therefore incapable of any valid application.'" *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (quoting *Steffel v. Thompson*, 415 U.S. 452, 474 (1974)); *see also*

*Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (explaining that "the facial/as-applied distinction affects the extent to which the invalidity of a statute need be demonstrated" (quotation marks omitted)); Richard H. Fallon, *Fact and Fiction About Facial Challenges*, 99 CAL. L. REV. 915, 925 (2011) [hereinafter *Fact and Fiction*] (explaining that the Supreme Court generally describes "any challenge that does not seek to establish that a statute is totally invalid" as an "as-applied" challenge). The term "facial attack" includes an attack on particular provisions or sections of a statute, even if a successful attack "could leave other aspects of [a] multipart enactment[] intact." *Fact and Fiction*, *supra*, at 925; *see also id.* at 925 n.36 (collecting cases).

Facial invalidation of legislation "is manifestly strong medicine" that should be employed "sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (quotation marks omitted); *see also Sabri v. United States*, 541 U.S. 600, 608 (2004) ("[F]acial challenges are best when infrequent."). Among other reasons, facial challenges are disfavored because they "often rest on speculation" and therefore "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri*). In addition, facial challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (quotation marks omitted).  Facial challenges also "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.[21] Accordingly, a party

---

[21] These concerns apply in this case, where OAHHS seeks facial invalidation not of isolated provisions of HB 2362, but of the statute in its entirety. OAHHS has not proposed a less severe alternative remedy.

raising a facial constitutional challenge confronts "a heavy burden." *Nat'l Endowment*, 524 U.S. at 580 (quotation marks omitted).

### b. Standard of Review

Just how heavy a burden a party raising a facial challenge confronts is disputed by the parties. Defendants invoke a standard that the Supreme Court articulated in *United States v. Salerno*, under which a challenger seeking facial invalidation of a law on vagueness grounds "must establish that no set of circumstances exists under which [the law] would be valid." 481 U.S. 739, 745 (1987). OAHHS responds that a broad "no set of circumstances" standard has been effectively repudiated by the Supreme Court and that the Ninth Circuit has recognized that repudiation.[22] Defendants reply that the cases on which OAHHS relies are distinguishable because they addressed statutes in which significant liberty interests were at stake.[23]

Neither the Supreme Court nor the Ninth Circuit has expressly limited the statements in those cases regarding the applicable standard to any specific context. The Court concludes, however, that it need not reach the issue of precisely what standard applies to a facial challenge under the circumstances presented here. Regardless of the specific standard that applies when evaluating a facial challenge in this context, OAHHS's challenge to HB 2362 would still fail. As discussed below, even under the less-demanding standard that would apply when evaluating an as-applied challenge, OAHHS has not shown that the law is unconstitutionally vague.

---

[22] ECF 31 at 18 (citing *Johnson v. United States*, 576 U.S. 591 (2015); *Sessions v. Dimaya*, 584 U.S. 148 (2018); *Guerrero v. Whitaker*, 908 F.3d 541 (9th Cir. 2018)).

[23] *Johnson* involved a clause of the Armed Career Criminal Act, which imposed an increased prison term upon a defendant with three prior convictions for a "violent felony." 576 U.S. at 593. *Dimaya* involved a similar clause in the Immigration and Nationality Act, under which any alien convicted of an "aggravated felony" could be deported. 584 U.S. at 153. *Guerrero* also involved an immigration removal statute. 908 F.3d at 542.

2. **Vagueness**

    a. **Background Principles**

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also* U.S. Const. amend. XIV (providing that no state "shall . . . deprive any person of life, liberty, or property, without due process of law"). The void-for-vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Grayned*, 408 U.S. at 108 (noting that vague laws violate the "basic principle of due process," including "fair warning" and "explicit standards for those who apply [the laws]").

    As to fair notice, a court will, in many contexts, consider whether a statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited."[24] *See Hill v. Colorado*, 530 U.S. 703, 732 (2000) (evaluating whether a criminal statute prohibiting any person from knowingly approaching within eight feet of another person near a health care facility without that person's consent was void for vagueness); *see also, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999) (holding that an anti-loitering ordinance that made it unlawful "to remain in any one place with no apparent purpose" was unconstitutionally vague and explaining that "[i]t is difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose'"). As to

---

    [24] As explained below, the "person of ordinary intelligence" standard may be adjusted, depending on the nature of the enactment at issue.

the second concern, the Supreme Court has stated that "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them," and that "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis." *Grayned*, 408 U.S. at 108-09.

The Supreme Court and the Ninth Circuit have recognized that "[m]any statutes will have some inherent vagueness" and that a certain quantum of vagueness is permissible—and even necessary. *See Rose v. Locke*, 423 U.S. 48, 49-50 (1975); *McSherry v. Block*, 880 F.2d 1049, 1054 (9th Cir. 1989) (quoting *Rose*); *see also Grayned*, 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language."); *Miller v. Strahl*, 239 U.S. 426, 434 (1915) ("Rules of conduct must necessarily be expressed in general terms and depend for their application upon circumstances, and circumstances vary."); *United States v. Powell*, 423 U.S. 87, 94 (1975) (explaining that a statute is not void for vagueness even when a legislature "might, without difficulty, have chosen clearer and more precise language equally capable of achieving the end which it sought" (cleaned up)).

Consistent with that recognition, "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *Parker v. Levy*, 417 U.S. 733, 757 (1974) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) (collecting cases)). Even criminal statutes, which are subject to a heightened (or more demanding) vagueness standard,[25] are not void for vagueness even if "trained lawyers . . . find it necessary to consult legal dictionaries, treatises, and judicial

---

[25] *See, e.g.*, *Hoffman*, 455 U.S. at 498-99 (noting that the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe"); *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009) ("For statutes . . . involving criminal sanctions[,] the requirement for clarity is enhanced." (quotation marks omitted)).

opinions before they may say with any certainty what [those] statutes may compel or forbid."

*Rose*, 423 U.S. at 50; *see also Nash v. United States*, 229 U.S. 373, 377 (1913) (Holmes, J.)

("[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as

the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may

he incur a fine or a short imprisonment . . . ; he may incur the penalty of death."). Similarly, even

for laws that restrict expressive activity, which are also subject to a heightened vagueness

standard,[26] "perfect clarity and precise guidance have never been required." *Holder v.*

*Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (quoting *United States v. Williams*, 553 U.S.

285, 304 (2008)).

　　　Accordingly, a challenger seeking to invalidate a statute for vagueness carries a heavy

burden.[27] A statute is unconstitutionally vague if it "specifie[s]" "no standard of conduct at all."

*United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021) (quoting *Coates v. Cincinnati*, 402

U.S. 611, 614 (1971)). Thus, to prevail on a challenge on vagueness grounds, "the complainant

must prove that the enactment is vague, 'not in the sense that it requires a person to conform his

conduct to an imprecise but comprehensible normative standard, but rather in the sense that no

standard of conduct is specified at all.'" *Hoffman*, 455 U.S. at 495 n.7 (quoting *Parker*, 417 U.S.

at 756 (quoting *Coates*)); *accord United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C.

---

[26] Laws that threaten or impinge on First Amendment freedoms are, like statutes that impose criminal penalties, subject to a heightened vagueness inquiry. *See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 793 (2011) (so stating); *see also* Matthew G. Stipe, *The Sherman Act and Avoiding Void-for-Vagueness*, 45 FLA. STATE UNIV. L. REV. 709, 738-39 (2019) (noting that laws implicating "First Amendment concerns are a particularly frequent trigger for . . . enhanced scrutiny").

[27] One scholar concluded that as of 1981, the Supreme Court had found only three civil statutes void for vagueness. Jeffrey I. Tilden, *Big Mama Rag: An Inquiry into Vagueness*, 67 VA. L. REV. 1543, 1553 n.60 (1981).

Cir. 2017) (applying the burden set forth in *Hoffman*); *see also, e.g.*, *Winters v. New York*, 333

U.S. 507, 519 (1948) (striking down a clause that had "no technical or common law meaning"

and for which the meaning could not be gleaned from context and finding that the law left open

"the widest conceivable inquiry, the scope of which no one can foresee and the result of which

no one can foreshadow or adequately guard against" (quoting *United States v. L. Cohen Grocery

Co.*, 255 U.S. 81, 89 (1921))).

### b.  Standard of Review

"The degree of vagueness that the Constitution tolerates—as well as the relative

importance of fair notice and fair enforcement—depends in part on the nature of the enactment."

*Hoffman*, 455 U.S. at 498; *accord Kashem v. Barr*, 941 F.3d 358, 370 (9th Cir. 2019) (construing

*Hoffman*). Writing for a plurality of the Supreme Court in 2018, Justice Kagan ratified this view.

*Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality opinion) (quoting *Hoffman*).

In *Hoffman*, the Supreme Court articulated four factors (the *Hoffman* factors) relevant to

whether a statute is unconstitutionally vague. A court must consider whether the statute:

(1) involves only economic regulation; (2) contains only civil penalties;[28] (3) includes a scienter

requirement; and (4) threatens constitutionally protected rights. *See Hanlester Network v.

Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (construing *Hoffman*). Discussing these factors, the

Supreme Court in *Hoffman* explained:

> [E]conomic regulation is subject to a less strict vagueness test
> because its subject matter is often more narrow, and because
> businesses, which face economic demands to plan behavior
> carefully, can be expected to consult relevant legislation in

---

[28] "A provision that nominally imposes only civil penalties but nonetheless carries a 'prohibitory and stigmatizing effect'" may also "warrant a 'relatively strict test.'" *Kashem*, 941 F.3d at 370 (quoting *Hoffman*, 455 U.S. at 499). In *Hoffman*, the municipality defending the ordinance at issue conceded that the ordinance was "quasi-criminal" and that "its prohibitory and stigmatizing effect may [have] warrant[ed] a relatively strict test." 455 U.S. at 499.

advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.

Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

455 U.S. at 498-99 (footnote citations omitted).

Although HB 2362 does not contain a scienter requirement, the three other *Hoffman* factors militate in favor of a more lenient vagueness standard here. HB 2362 regulates only economic activity, imposes only civil penalties,[29] and does not inhibit or threaten to inhibit the

---

[29] OAHHS points out that some courts have "recognized that imposition of civil penalties can raise the same concerns as statutes classified as criminal" and asks this Court to apply a stricter standard of review based on HB 2362's civil penalty provision, which imposes fines of up to $10,000 for each offense. *See* ECF 39 at 15-16; ORS § 415.900. In support, OAHHS cites two cases from other circuits, neither of which meaningfully support applying a stricter standard of review in this case. In *Advance Pharmaceutical, Inc. v. United States*, 391 F.3d 377 (2d Cir. 2004), the court did not address the issue of whether the provision at issue was, in fact, quasi-criminal (nor did the defendant contend that it was). *See id.* at 396. In addition, both cases on which OAHHS relies involved substantial penalties available under the federal Controlled Substances Act. *See id.* at 390 (addressing provision of the Controlled Substances Act for which the violators who challenged the provision on vagueness grounds had been fined $2 million); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991) (finding, in a vagueness challenge asserted by defendants who had been fined $615,000 for violations of the Controlled Substances Act, that the "prohibitory effect" of penalties under 21 U.S.C. § 822(e) were "quasi-criminal" and therefore warranting a "relatively strict" vagueness test). OAHHS has pointed to no case from the Supreme Court or the Ninth Circuit indicating that a civil penalty, simply because of its "penal" nature, warrants a strict test, or any other such case suggesting that the civil penalties available under HB 2362 should otherwise be regarded as "quasi-criminal." Even if the Court were to apply a "relatively strict test," *see Hoffman*, 455 U.S. at 499, the Court would nonetheless conclude that HB 2362 is not impermissibly vague under that standard— especially considering the high bar for a facial challenge.

exercise of constitutionally protected rights. The Supreme Court found that the ordinance at issue

in *Hoffman*, which made unlawful the unlicensed sale of any "accessory or thing which is

designed or marketed for use with illegal . . . drugs," was not impermissibly vague even though

only the first and fourth *Hoffman* factors favored a more lenient standard of review[30]—as they do

here. *See* 455 U.S. at 499-500.

Three aspects of the first *Hoffman* factor (whether the statute involves only economic

regulation) warrant emphasis. First, although courts must often consider whether a statute "fails

to provide a person of ordinary intelligence fair notice of what is prohibited," *see Hill*, 530 U.S.

at 732, the Supreme Court applies a different standard to laws that regulate economic activity:

whether a "*business person* of ordinary intelligence would understand" the conduct prohibited.

*Hoffman*, 455 U.S. at 501 (emphasis added); *accord Great Am. Houseboat Co. v. United*

---

Relatedly, OAHHS relies on the Supreme Court's decision in *Fox* to argue for a stricter
standard of review. OAHHS notes that the Supreme Court in *Fox* upheld an as-applied
vagueness challenge in part because of the "reputational injury" to Fox Television that resulted
from a Federal Communication Commission (FCC) order sanctioning the network for
broadcasting indecent content. *See* ECF 39 at 16 (quoting *Fox*, 567 U.S. at 255). OAHHS,
however, has not presented evidence—let alone explained in its briefing—how OAHHS might
suffer a "reputational injury" resulting from enforcement of HB 2362 comparable to that suffered
by Fox Television. *See Fox*, 567 U.S. at 256 (describing the FCC's orders sanctioning Fox
Television for, among other things, failing to protect children from being exposed to "explicit,
graphic, vulgar, and shocking" content and noting that "[FCC] sanctions on broadcasters for
indecent material are widely publicized" and "could have an adverse impact on Fox's reputation
that audiences and advertisers alike are entitled to take into account" (quotation marks omitted));
*also cf. Hoffman*, 455 U.S. at 499 n.16 (acknowledging the "prohibitory and stigmatizing effects"
of the challenged ordinance, which governed the sale of drug paraphernalia). Accordingly, the
Court rejects OAHHS's argument that the availability of civil penalties under HB 2362 warrants
application of a stricter vagueness standard.

[30] The ordinance at issue in *Hoffman* regulated only economic activity; the village
conceded that the ordinance was 'quasi-criminal' (and the Court found the ordinance sufficiently
clear as applied, even under a test "appropriate to either a quasi-criminal or a criminal law"); the
ordinance did not include a scienter requirement; and the ordinance did not threaten the exercise
of constitutionally protected rights. *See* 455 U.S. at 492, 499-500.

*States*, 780 F.2d 741, 747 (9th Cir. 1986) (rejecting vagueness challenge to regulation banning "commercial use" of houseboats on Shasta Lake, concluding that although the regulations were "not without ambiguity," a "business person of ordinary intelligence would understand" the scope of activities that would be considered "commercial use"[31]); *Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 809 F. Supp. 747, 761 (N.D. Cal. 1992) (applying the "businessperson of ordinary intelligence" standard to challengers to a law criminalizing certain commercial speech), *aff'd*, 44 F.3d 726 (9th Cir. 1994); *cf. Brockert v. Skornicka*, 711 F.2d 1376, 1381 (7th Cir. 1983) ("Like a businessman, plaintiff would be expected to consult the law governing his employment and seek clarification if necessary."); *see also United States v. Facteau*, 89 F.4th 1, 33 n.20 (1st Cir. 2023) (explaining that "[c]ourts are less likely to conclude that statutes and regulations addressed to sophisticated businessmen and corporations are unconstitutionally vague" in part "because of an assumption that, given the complexity of economic regulation, such parties necessarily consult counsel in planning their activities" (quotation marks omitted)).

Relatedly, courts—including the Supreme Court—consistently evaluate the vagueness of a law in light of the sophistication of the persons or entities subject to that law. *See, e.g.*, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162-63 (1972) (striking down a vagrancy law under the "person of ordinary intelligence" standard, noting that "[t]he poor among us, . . . the average householder[,] are not in business and not alerted to the regulatory schemes of vagrancy laws");[32] *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) (applying a "doctors of ordinary

---

[31] Although *Great American Houseboat Co.* addressed a vagueness challenge to a federal administrative regulation, not a statute, the Ninth Circuit relied on several cases addressing vagueness challenges to state and federal statutes—including *Stoianoff v. Montana*, 695 F.2d 1214 (9th Cir. 1983), in which the court evaluated a vagueness challenge to a state law under the framework set forth in *Hoffman*.

[32] OAHHS relies on *Fox*, in which the Supreme Court invoked the "person of ordinary intelligence" standard even though the regulated entities who challenged the statute were major

PAGE 25 – OPINION AND ORDER

intelligence" standard to a law prohibiting certain medical procedures (quotation marks omitted)); *Omaechevarria v. Idaho*, 246 U.S. 343, 345 n.4, 348 (1918) (rejecting vagueness challenge to state statute prohibiting any person having charge of sheep from allowing them to graze "upon any range usually occupied by any cattle grower," explaining that persons "familiar with range conditions and desirous of observing the law will have little difficulty in determining what is prohibited by it"); *Henry v. Radius Glob. Sols., LLC*, 357 F. Supp. 3d 446, 460 (E.D. Pa. 2019) ("Debt collectors are sophisticated parties involved in a business requiring them to understand the law in the jurisdiction where they conduct such business."); *see also* Daniel B. Rice, *Reforming Variable Vagueness*, 23 U. PA. J. CONST. L. 960, 1015-16 (2021) (collecting cases applying "[t]he principle of customized ordinary intelligence" and noting that "[i]nnumerable decisions endorse the technique of class-based fair notice"). This consideration militates in favor of a lenient standard of review here. HB 2362 governs complex business activities and applies only to transactions in which at least one participating entity has had, or is projected to have, substantial revenue. *See* ORS § 415.500(6)(a). HB 2362 is not a law directed at "[t]he poor among us . . . [or] the average householder[,] [who] are not in business and not alerted to the regulatory schemes." *See Papachristou*, 405 U.S. 162-63.

Second, *Hoffman* teaches that a vagueness challenge to a law that regulates only economic activity cannot succeed if "administrative regulations . . . sufficiently narrow potentially vague or arbitrary interpretations of the [law]." 455 U.S. at 504. That principle

---

broadcast networks. *See* 567 U.S. at 254. The sophistication of the regulated entities in that case, however, was irrelevant. First, the statute at issue in *Fox* was not a civil statute governing complex economic activity: it was a criminal statute banning the broadcast of "any obscene, indecent, or profane language by means of radio communication." *Id.* at 243 (quoting 18 U.S.C. § 1464). Second, the Supreme Court found a lack of fair notice because the FCC had made an abrupt change in its enforcement policy without providing fair notice to Fox or ABC. *See id.* at 254.

applies not only to an agency's promulgated regulations, but also to additional "guidelines" and

"enforcement policy," which might clarify the law. *See id.* at 502.[33] The Supreme Court has

considered a range of agency-promulgated rules and guidance when addressing vagueness

challenges to statutes. *See, e.g.*, *Fox*, 567 U.S. at 254 (addressing the purported vagueness of a

law banning the broadcast of "any obscene, indecent, or profane language" and considering

whether "the [Federal Communication] Commission *policy* in place at the time of . . .

broadcasts" that resulted in the challenged enforcement actions gave notice about whether certain

words or pictures could be actionably indecent (emphasis added)); *Buckley v. Valeo*, 424 U.S. 1,

40 n.47 (1976) (in addressing a statutory provision restricting political expenditures "relative to a

clearly identified candidate," noting that "a comprehensive series of *advisory opinions or a rule*"

clarifying the scope of the challenged statute "might alleviate the provision's vagueness

problems"[34] (emphasis added)); *see also Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 571 (9th

Cir. 2018) ("[A]n agency-issued *instruction manual*, even if lacking the force of law itself, can

clarify what conduct is expected of a person subject to a particular regulation and thus mitigate

against vagueness." (emphasis added)). The lesson from these cases is that any challenge to

HB 2362 on vagueness grounds must be evaluated using not only OHA's implementing

regulations but also any pertinent sub-regulatory guidance.

---

[33] Because the Supreme Court in *Hoffman* found that under the ordinance and then-existing guidelines covered "at least some of the items sold by Flipside," the Court did not reach whether "further guidelines, administrative rules, or enforcement policy [would] clarify the more ambiguous scope of the [ordinance] in other respects." 455 U.S. at 500, 502.

[34] In *Buckley*, the Supreme Court concluded that the availability of advisory opinions would not cure the statute's vagueness problems, but that was because the statute authorized only narrow classes of individuals and groups to request an advisory opinion. *See* 424 U.S. at 40, n.47. *Buckley* was superseded by statute on other grounds. *See generally McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003).

Third and perhaps most important, the Supreme Court in *Hoffman* concluded that a less strict vagueness test should apply to economic regulation in part because "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." 455 U.S. at 498. Although the Supreme Court in *Hoffman* did not hold that a regulated party's ability to obtain pre-enforcement guidance about a vague statutory provision would, standing alone, defeat a vagueness challenge, the Supreme Court has consistently found the availability of such a process to weigh heavily against a finding of unconstitutional vagueness. *See, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 160 (1974) (rejecting vagueness challenge to a statutory provision authorizing removal of certain employees from the federal service for "such cause as will promote the efficiency of the service," noting that by regulation, the agency in which the plaintiff worked, had "provided by regulation that its Office of General Counsel [was] available to counsel employees who seek advice on the interpretation of the [statute] and its regulations"); *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 580 (1973) (rejecting a vagueness challenge to the Hatch Act and its implementing regulations, finding "important . . . that the [Civil Service] Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law"); *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 48-49 (1966) (rejecting a claim of vagueness centered on the meaning of "principal or substantial" in the statutory definition of "related person," explaining that "where the determination of 'related persons' is unclear, the appellants will have access to the [New York State Liquor] Authority for a ruling to clarify the issue"), *abrogated on other grounds by Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989); *see also Roark & Hardee LP v. City of Austin*, 522

F.3d 533, 552 (5th Cir. 2008) (rejecting vagueness challenge to an ordinance, finding that "the owners and operators regulated by the ordinance may clarify the meaning of its provisions by their own inquiry" (citing *Hoffman*)); *Facteau*, 89 F.4th at 33 n.20 (explaining that "[c]ourts are less likely to conclude that statutes and regulations addressed to sophisticated businessmen and corporations are unconstitutionally vague" in part because "some administrative process will often be available to secure advisory interpretations of the statute or regulation at issue" (cleaned up)). The availability of such a process to parties subject to HB 2362—who may obtain without fee or other charge a determination whether a prospective transaction will be covered—is yet another factor that favors applying a more lenient vagueness standard.

Based on the *Hoffman* factors and their application, the Court concludes that a lenient standard of review applies here. Three of the four *Hoffman* factors favor leniency. First, the considerations that dictate a more lenient standard of review for laws that regulate only economic activity apply in force here: the statute applies to a limited class of businesses with specialized knowledge; OHA has issued detailed regulations and guidance clarifying the scope of the statute; and a regulated party may obtain even further clarification of the meaning or applicability of the statute through an administrative process. Second, the law imposes only civil penalties. Third, under what is "perhaps the most important factor," the law does not "threaten[] to inhibit the exercise of constitutionally protected rights." *See Hoffman*, 455 U.S. at 499.[35]

---

[35] For the reasons explained below, even under a "relatively strict test" that would apply to a "quasi-criminal" statute with a "prohibitory and stigmatizing effect," *see Hoffman* 455 U.S. at 499, the Court would nonetheless conclude that HB 2362 is not unconstitutionally vague. *See supra* note 29.

### c.  Application

OAHHS argues that HB 2362 violates the void-for-vagueness doctrine because it fails to provide fair notice and encourages arbitrary enforcement. With the *Hoffman* factors in mind, the Court now turns to these arguments made by OAHHS.

### i.  Fair Notice

As to fair notice, OAHHS argues that HB 2362 fails to provide fair notice because it does not sufficiently define which entities will be subject to the statute's requirements; does not sufficiently define the scope of the conduct it regulates; and does not sufficiently circumscribe the criteria that OHA applies when conducting preliminary and comprehensive reviews. The Court considers each of these arguments in turn.

### (A)  "Health Care Entity"

As to the entities subject to HB 2362's requirements, OAHHS makes three arguments. First, OAHHS asserts that the definition of "health care entity" is impermissibly vague because it is "entirely open-ended." Second, OAHHS objects to the definition of "hospital system" because that term is not defined in the statute (which directs OHA to define "hospital system" by rule). Third, OAHHS argues that terms in the residual provision of the definition of "health care entity" fail to provide a sufficiently ascertainable standard.

OAHHS does not, however, argue that the definition of "health care entity" is vague as applied to any of its members—*i.e.*, that any of its members are unsure whether HB 2362 would apply to them if they engaged in a qualifying transaction. As a general rule, a party lacks standing to challenge a law on the asserted ground that the law "would be unconstitutionally applied to different parties and different circumstances from those at hand." *Sabri*, 541 U.S. at 609; *see also, e.g.*, *United States v. Van Hawkins*, 899 F.2d 852, 854 (9th Cir. 1990) ("Brown and Hawkins cannot establish a constitutional violation by asserting that the law is unclear with

respect to those who distribute other, more exotic forms of cocaine; instead, they must demonstrate the statutes are vague in their case."). OAHHS has not identified any applicable exception to that general rule, nor is the Court aware of any such exception. *Cf. Sabri*, 541 U.S. at 609-10 (listing the "relatively few settings" in which the Supreme Court has "recognized the validity of facial attacks alleging overbreadth" and noting that "[o]utside these limited settings, and absent a good reason, we do not extend an invitation to bring overbreadth claims"[36]). Accordingly, the Court finds that OAHHS lacks standing to bring a facial challenge to the definition of "health care entity."

### (B)   "Material Change Transaction"

OAHHS also argues that HB 2362 is fatally vague as to the specific transactions subject to its provisions—*i.e.*, "material change transactions." Among other things, OAHHS points to the statutory definition of "transaction," which includes "[n]ew contracts, new clinical affiliations[,] and new contracting affiliations that will *eliminate or significantly reduce*, as defined by [OHA] by rule, *essential services*." ORS § 415.500(10) (emphases added). OAHHS contends that the definition of "material change transaction" is impermissibly vague because the statute itself does not define "eliminate or significantly reduce." OAHHS also points to the term "essential services," which is defined by statute to include "*services that are essential to achieve health equity*." ORS § 415.500(2)(b) (emphasis added). According to OAHHS, the term "health

---

[36] "[O]verbreadth challenges call for relaxing familiar requirements of standing, to allow a determination that the law would be unconstitutionally applied to different parties and different circumstances from those at hand." *Sabri*, 541 U.S. at 609; *see also* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 100-01 (7th ed. 2023) (explaining that the overbreadth doctrine is an exception to the prohibition against third-party standing and discussing its application).

equity" is impermissibly vague because it has "no common or ascertainable meaning" but instead must be defined by the Oregon Health Policy Board[37] and OHA. *See* ORS 415.500(5).

These terms, however, are all clarified by OHA by rule. *See* OAR 409-070-0010(3) (defining "significant reduction in services"); OAR 409-070-0005(28) (defining "services that are essential to achieve health equity" to include four categories of health care services); OAR 409-070-0005(18) (defining "health equity");[38] *see also* OHA, *Defining Essential Services and Significant Reduction* (Jan. 31, 2022)[39] (guidance document outlining a two-part test for health care entities to determine whether a proposed transaction will reduce an essential service and whether that reduction is "significant").

The gravamen of OAHHS's arguments is that HB 2362 impermissibly *delegates* to OHA the authority to define those terms. *See, e.g.*, ECF 31 at 24 (asserting that OHA "has complete and standardless discretion" to define what qualifies as a "transaction"); *id.* at 25 (asserting that "whether a contract will qualify as a 'material change transaction' depends entirely on undefined impacts that [OHA], in its complete and sole discretion, will identify"). For the reasons

---

[37] The Oregon Health Policy Board is a nine-member citizen board the oversees OHA. *See* OHA, Oregon Health Policy Board: About the Oregon Health Policy Board, OREGON.GOV, https://www.oregon.gov/oha/ohpb/pages/index.aspx.

[38] Insofar as OAHHS challenges the definition of "material change transaction" for lack of fair notice, OHS's definition of "health equity" has no direct relevance. The statutory definition of "transaction" includes, among other things, certain contracts and affiliations "that will eliminate or significantly reduce . . . essential services." ORS § 415.500. The statute defines "essential services" to include, among other things, "services that are essential to achieve health equity." ORS § 415.500(2). Although OHS's regulations include a separate definition of "health equity," *see* OAR 409-070-0005(18), the regulations also directly define "services that are essential to achieve health equity" to include four discrete categories of services, *see* OAR 409-070-0005(28).

[39] https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO-Essential-Services-and-Significant-Reduction-Guidance-FINAL.pdf.

explained below, the Court finds OAHHS's delegation arguments inapposite in this facial vagueness challenge.

The Court acknowledges that a statute that delegates authority to an enforcing agency to clarify the statute's scope may raise delegation issues, and the principles underlying the doctrines of vagueness and nondelegation overlap. *See Dimaya*, 584 U.S. at 156 (plurality opinion) (recognizing that the void-for-vagueness doctrine "is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not"); *id.* at 182 (Gorsuch, J., concurring in part) ("[V]ague laws risk allowing judges to assume legislative power. Vague laws also threaten to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's contours through their enforcement decisions."). Thus, as the Supreme Court has explained, a criminal statute that "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis" is void for vagueness. *Grayned*, 408 U.S. at 108-09.

The Supreme Court has clarified, however, that at least for a law that regulates economic activity, an enforcing agency's implementing regulations and sub-regulatory guidance, and the availability of a pre-enforcement inquiry process, may mitigate or even cure otherwise impermissible statutory vagueness. *See, e.g.*, *Hoffman*, 455 U.S. at 504 (holding that a challenge to a law regulating economic activity cannot succeed if "administrative regulations . . . sufficiently narrow potentially vague or arbitrary interpretations of the [law]"); *id.* at 502 (applying the same principle to additional "guidance" and "enforcement policy"); *id.* at 498 (explaining that a regulated entity's "ability to clarify the meaning" of a law "by resort to an administrative process" weighs against a finding of vagueness). Thus, when some combination

of extra-statutory regulations or guidance or the availability of a pre-enforcement inquiry process sufficiently mitigates concerns of fair notice and arbitrary enforcement related to an otherwise vague statute, a plaintiff may challenge the statute as violating principles of nondelegation, but not due process. In this case, for the reasons explained below, the Court concludes that OAHHS has failed to establish that the definition of "material change transaction," when considered in light of OHA's rules and guidance and the availability of a pre-enforcement inquiry process, is impermissibly vague. OAHHS may therefore assert its delegation arguments only under its Second Claim—arguing that the law violates the nondelegation requirements of the Oregon Constitution.[40]

OAHHS argues that the statute's definition of "material change transaction," even as clarified by the OHA, is unconstitutionally vague because, in some cases, a transaction may be subject to review because of "the possibility that something may occur in the future, meaning there is no way for a party to a transaction to determine, ex ante, whether they may be subject to penalties for failing to seek approval." ECF 31 at 25; *see also* ORS § 415.500(6)(a)(A)(ii) ("material change transactions" include specified transactions in which a participating "new entity[] *is projected to have* at least $10 million in revenue in the first full year of operation at normal levels of utilization or operation as prescribed by [OHA] by rule" (emphasis added)); *id.* § 415.500(6)(a)(B) ("material change transaction" includes, "[i]f a transaction involves a health care entity in this state and an out-of-state entity, a transaction that otherwise qualifies as a material change transaction . . . that *may result* in increases in the price of health care or limit access to health care services in [Oregon]" (emphasis added)).

---

[40] *See generally*, Benjamin Silver, *Nondelegation in the States*, 75 VAND. L. REV. 1211 (2022) (contrasting state nondelegation doctrines, which apply against state laws, with the federal nondelegation doctrine, which applies against federal laws).

PAGE 34 – OPINION AND ORDER

In light of Supreme Court and Ninth Circuit decisions evaluating statutory provisions challenged for vagueness on similar grounds, and especially considering the availability of pre-notice inquiry, the Court finds unpersuasive OAHHS's argument that the definition of "material change transaction" is unconstitutionally vague because it requires a prediction of future events. OAHHS has cited no case standing for the proposition that a statute fails to provide fair notice because it requires such a prediction or does so without precise guidance. Rather, relevant authorities indicate otherwise. *See, e.g.*, *Kashem*, 941 F.3d at 364 ("Here, the No Fly List criteria are not impermissibly vague merely because they require a prediction of future criminal conduct, or because they do not delineate what factors are relevant to that determination[.] The criteria are 'reasonably clear[.]'" (citations omitted) (quoting *Hoffman*)); *Dimaya*, 584 U.S. at 159 ("Many perfectly constitutional statutes use imprecise terms like 'serious potential risk' . . . or 'substantial risk' . . . .").

In addition, even if any of OAHHS's member entities might be unsure whether a prospective transaction might fall within the law's ambit, that entity may avail itself of OHA's pre-notice inquiry process. *See* OAR 409-070-0042(1) (providing that "[a]ny party to a proposed transaction may . . . request[] a determination whether such transaction is a covered transaction," and requiring OHA to notify the inquiring party in writing of the agency's determination with 30 calendar days). As discussed above, the Supreme Court has consistently found the availability of such a process to weigh heavily against a finding of unconstitutional vagueness. In fact, the Court is unaware of any federal or state court decision holding that an analogous provision was void for vagueness when the agency responsible for enforcing the statute made available a reasonable process for pre-enforcement inquiry about the provision's scope. *Cf. Sanimax USA, LLC v. City of South Saint Paul*, 95 F.4th 551, 570-71 (8th Cir. 2024) (concluding that "extra-

PAGE 35 – OPINION AND ORDER

statutory communications" in the form of a warning letter and instructions on what was needed

to comply with a zoning ordinance were enough to provide "fair warning"); *United States v.*

*Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122-23 (5th Cir. 1991) ("The courts are ill disposed to

entertain the vagueness challenges of a party who had ample warning that his actions violated

statutory requirements." (citing *Hoffman*)), *cited with approval in Craft v. Nat'l Park Serv.*, 34

F.3d 918, 923 (9th Cir. 1994). Moreover, even if the Court were to agree with OAHHS that the

specific statutory provisions in the definition of "material change transaction" that require a

prediction of future conduct *were* impermissibly vague, that would not justify granting the only

relief OAHHS seeks: facial invalidation of HB 2362 in its entirety.[41]

    OAHHS also argues that OHA's regulations clarifying the scope of covered "material

change transactions" are impermissibly vague and therefore fail to cure the (purported)

vagueness in one of the five types of "transactions" enumerated in the statute: certain contracts

and affiliations "that will eliminate or significantly reduce . . . essential services." *See* ORS

§ 415.500(10)(c). As explained, the statue defines "essential services" to include, among other

things, "services that are essential to achieve health equity," ORS § 415.500(2); in turn, OHS's

regulations define "services that are essential to achieve health equity" to include four types of

services:

> (a) Any service directly related to the treatment of a chronic
> condition;
>
> (b) Pregnancy-related services;

---

[41] Under the statutory definition of "material change transaction," the materiality
determination does not always require a prediction of future events. *See* ORS § 415.500(6)(a)
(defining "material change transaction" to include, among other things, "[a] transaction in which
at least one party had average revenue of $25 million or more in the preceding three fiscal years
and another party . . . [h]ad an average revenue of at least $10 million in the preceding three
fiscal years").

(c) Prevention services including non-clinical services; or

(d) Health care system navigation and care coordination services.

OAR 409-070-0005(28). According to OAHHS, "the breadth of that definition, which includes a vast swath of health-care related services, demonstrates the complete absence of any statutory guidance," and regulated entities must guess whether the services they provide fall within that definition. As the Ninth Circuit has explained, however, "breadth is not the same thing as vagueness." *Pac. Choice Seafood Co. v. Ross*, 976 F.3d 932, 945 (9th Cir. 2020); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (quotation marks omitted)). Nor has OAHHS identified any case in which a court found a statute or regulation with analogous provisions void for vagueness in a similar context.

In light of OHA's regulations clarifying the scope of "material change transaction," especially when combined with the availability of pre-notice inquiry, OAHHS has failed to demonstrate that HB 2362 is facially invalid for vagueness based on the statutory definition of "services that are essential to achieve health equity." *See Hoffman*, 455 U.S. at 504 (noting that "administrative regulations" may "sufficiently narrow potentially vague or arbitrary interpretations" of a law); *id.* at 498 (explaining that a "regulated enterprise may have the ability to clarify the meaning of the regulation . . . by resort to an administrative process"). Further, even if the Court agreed with OAHHS that the statutory definition of "essential services" is impermissibly vague and that its vagueness is not cured by OHS's regulations, that would not support granting the relief OAHHS seeks: facial invalidation of HB 2362 in its entirety.[42] For all

---

[42] As relevant here, OAHHS challenges on vagueness grounds the term "essential services," which is found in only one of the five enumerated types of "transactions" listed in the statute: certain contracts and affiliations "that will eliminate or significantly reduce . . . essential services." ORS § 415.500(10)(c). "Essential services," in turn, is defined by statute to include

the above reasons, the Court rejects OAHHS's facial vagueness challenge to HB 2362 arising from the definition of "material change transaction."

### (C)  Review Criteria

OAHHS also argues that HB 2362 fails to provide fair notice because the law itself does not include sufficiently circumscribed criteria for OHA to apply when conducting preliminary and comprehensive reviews. Again, OAHHS's argument is mainly one of delegation: OAHHS challenges HB 2362 on the ground that the law delegates too much authority to OHS to develop additional criteria that govern approval of covered transactions. *See, e.g.*, ECF 31 at 27 (challenging the criteria applicable to a comprehensive review on the ground that "parties might be able to satisfy every requirement that the legislature imposed, but the transaction would *still* not be approved because it did not satisfy [OHA's] additional requirements" (emphasis in original)). According to OAHHS, HB 2362 is impermissibly vague because the law "provides no standard or guidance for what [OHA's promulgated additional criteria] must require." *Id.*

In so arguing, OAHHS disregards the guidance to OHA set forth in the statute. *See* ORS § 415.501(2) (directing OHA to develop rule criteria consistent with subsection (1), which sets forth the purposes of ORS § 415.501); *cf. Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1309-10 (11th Cir. 2009) (concluding that a statutory purpose of "ensur[ing] the orderly and efficient operation of public vehicles upon the public highways" was sufficient to guide a transportation commission's enforcement of a provision requiring that a waiver be granted "when the person subject to [a] rule demonstrates that the purpose of the underlying statute will be or has been achieved by other means" (quotation marks omitted)). More important

---

two categories of services, only one of which ("services that are essential to achieve health equity") OAHHS challenges on vagueness grounds.

for purposes of fair notice, OAHHS has pointed to no case in which a court concluded that a law failed to provide fair notice because it delegated to an enforcing agency authority to develop, in addition to criteria enumerated by statute, additional criteria to regulate covered entities. The Court sees no basis for applying such a rule in this case.[43]

Notably, the criteria that OAHHS challenges govern *only* whether a transaction will be *approved or denied* after a formal notice has been filed. As relevant here, a covered entity is not subject to an enforcement action under HB 2362 unless the entity has (1) failed to submit notice of a covered transaction in which the entity engages; (2) engaged in a transaction for which the entity has submitted notice but which has not been approved; or (3) engaged in a transaction that the entity knows—after the completion of a comprehensive review—is prohibited. In other words, an entity is not subject to an enforcement action simply because OHA, applying the

---

[43] Given the ubiquity of similar legislative grants of authority to enforcing entities, such a rule could have sweeping implications. *See, e.g.*, *Fife v. Harmon*, 171 F.3d 1173, 1174-75 (9th Cir. 1999) (discussing the "extensive regulations" issued by the Secretary of Labor under the Fair Labor Standards Act, including "additional criteria" promulgated by rule that govern exemptions to federal overtime requirements); *Khamooshpour v. Holder*, 781 F. Supp. 2d 888, 894 (D. Ariz. 2011) (discussing Immigration and Nationality Act regulations that supplement non-exclusive criteria enumerated in the statute with "additional criteria" governing "when a naturalization applicant shall be found to lack good moral character"); ORS §§ 307.517(2), 518(2) (in statute governing property tax exemptions, granting certain governing bodies broad authority to "adopt additional criteria for exemption," provided that the criteria do not conflict with enumerated criteria); D.C. CODE § 8-231.10 (requiring certification for entities conducting lead-based paint activities and for which violators may be subject to civil fines and penalties, and granting mayor broad authority to establish, in addition to certification criteria enumerated by statute, "additional criteria and procedures for certification by rule"); KAN. STAT. ANN. § 65-16,130 (provision of state pharmacy act—which provides for civil fines of up to $5,000 for violations of the act or the rules promulgated by the state board of pharmacy—granting the board authority to impose requirements on certain pharmacies in the form of criteria that include but are not limited to those enumerated by statute); *see also* ORS § 819.120(9) (directing the Oregon Transportation Commission to establish, in addition to criteria enumerated by statute, "additional criteria for determining when vehicles on state highways, interstate highways[,] and state property are subject to being taken into immediate custody"); *cf. Maldonado v. Lopez*, 2011 WL 1630824, at *2 (C.D. Cal. 2011) (discussing state penal code's implementing regulations, which "set forth additional criteria for determining whether a prisoner is suitable for parole").

criteria that OAHHS challenges, decides not to approve a proposed transaction. The law's requirement that OHA develop additional approval criteria consistent with the purposes of HB 2362 therefore does not create a risk of "trap[ping] the innocent by not providing fair warning." *See Grayned*, 408 U.S. at 108; *cf. Papachristou*, 405 U.S. at 166 (criticizing vagrancy statutes that permit *arrest and prosecution* without "notice of conduct to be avoided" (quoting *Winters*, 333 U.S. at 540 (Frankfurter, J., dissenting)).

For all the above reasons, the Court finds unpersuasive OAHHS's argument that HB 2362 fails to provide fair notice on the asserted ground that the law requires OHA to develop extra-statutory criteria to govern approval of covered transactions.[44]

### ii. Arbitrary Enforcement

A statute also can be void for vagueness under the Due Process Clause if it poses a "*significant* risk" of arbitrary enforcement. *Skilling v. United States*, 561 U.S. 358, 412 (2010) (emphasis added) (rejecting vagueness challenge to criminal statute in absence of a "significant risk" of arbitrary enforcement); *see also Stoianoff v. Montana*, 695 F.2d 1214, 1222 (9th Cir. 1983) (rejecting vagueness challenge in absence of a "clear indication" that the challenged law would be enforced arbitrarily). Even criminal laws delegate a permissible degree of discretion to those responsible for enforcement. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) (discussing the "broad discretion" retained by the Attorney General and U.S. Attorneys to enforce federal laws); *Hill*, 530 U.S. at 733 ("As always, enforcement requires the exercise of some degree of police judgment[.]" (quoting *Grayned*)); *Ward v. Rock Against*

---

[44] OAHHS also argues, in part, that some of the additional criteria promulgated by rule are impermissibly vague. Even if the Court were to agree with OAHHS that some of the additional criteria developed by OHA are unconstitutionally vague, that would not warrant facial invalidation of HB 2362.

*Racism*, 491 U.S. 781, 794 (1989) (upholding law that restricted expressive activity even though it provided "undoubtedly flexible standards" and granted "considerable discretion" to the officials responsible for implementing those standards). Thus a mere "*possibility* that [a law] will be enforced arbitrarily[] 'is of no due process significance unless the possibility ripens into a prosecution." *Stoianoff*, 695 F.2d at 1222 (emphasis added) (quoting *Hoffman*, 455 U.S. at 503 n.21).

As to the danger of arbitrary enforcement, OAHHS mainly focuses on a purported "absence of legislatively[] enacted review criteria." Here, again, OAHHS's argument is effectively one of delegation: OAHHS argues that HB 2362 invites arbitrary enforcement because it delegates too much authority to OHA to develop the criteria that ultimately guide OHA's implementation of the law. OAHHS does not point to any authority to support the proposition that a risk of arbitrary enforcement that violates due process may be found only because a statute delegates to an agency the authority to develop rules to guide implementation.[45] In any event, even if the Court were to entertain that theory in this facial vagueness challenge, for the reasons explained below, OAHHS has not met its burden to show a "significant risk" of arbitrary enforcement with respect to the provisions governing review criteria—or any other provision of HB 2362. *See Skilling*, 561 U.S. at 412.

No provision of HB 2362 "delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis," as the Supreme Court cautioned against in *Grayned*. 408 U.S. at 108-09; *see also Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (striking

---

[45] Nor does the Court agree with OAHHS that HB 2362 fails to provide OHA with sufficient guidance to ensure that the agency-promulgated rule criteria are not themselves arbitrary. *See* ORS § 415.501(2) (directing OHA to develop rule criteria consistent with subsection (1), which sets forth the purposes of ORS § 415.501).

down law that "necessarily entrust[ed] lawmaking to the moment-to-moment judgment of the

policeman on his beat" (quotation marks omitted)). Nor is HB 2362 a law that raises the specter

of "discriminatory enforcement . . . against those who may hold politically unpopular beliefs or

lead unusual lifestyles." *See Stoianoff*, 695 F.2d at 1222 (evaluating vagueness of law prohibiting

the manufacture or delivery of drug paraphernalia); *see also Papachristou*, 405 U.S. at 171

(striking down anti-vagrancy ordinance with "imprecise terms" that "generally implicated . . .

poor people, nonconformists, dissenters, [and] idlers"). Nor, for that matter, has OAHHS

presented any evidence that HB 2362 has been employed in an arbitrary manner in any instance

following its enactment. Even if there is a "*possibility* that [HB 2362] may be enforced

arbitrarily," there is no "clear indication" that the law will be enforced arbitrarily. *See Stoianoff*,

695 F.2d at 1222.

 In addition, any possibility of arbitrary enforcement is mitigated by the processes

available to regulated parties and under which OHA implements the law. Regulated entities can

avail themselves of pre-notice review. *See* OAR 409-070-0042. Parties to a material change

transaction for which a formal notice must be filed may participate in a pre-filing conference.

OAR 409-070-0045(2). If OHA decides to conduct a comprehensive review, the agency must

offer a "comprehensive review conference." *Id.* By rule, OHA must analyze information

provided in a notice of a material change transaction under standards published on OHA's

website and that must be "clear, fair, predictable, and consistent." OAR 409-070-0045(9), (9)(a).

At the conclusion of a comprehensive review, OHA must issue a proposed order and proposed

factual findings and conclusions of law, and the parties and the public are given a chance to

make written comments to the proposed findings and conclusions and the proposed order.

OAR 409-070-0060(4). Before issuing a final order, OHA must consider these comments, which

must be made available to the public. *See* OAR 409-070-0060(4), (5). In sum, HB 2362 is not a law that "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *See Grayned*, 408 U.S. at 108-09. Even under a strict standard of review, OAHHS has failed to show a "significant risk" of arbitrary enforcement that would justify facial invalidation of HB 2362. *See Skilling*, 561 U.S. at 412.

### d.  Conclusion

Regardless of the specific standard that applies when evaluating facial challenges generally, OAHHS has failed to show that HB 2362 is unconstitutionally vague on its face on the asserted grounds that the law fails to provide fair notice or poses a significant risk of arbitrary enforcement. Accordingly, the Court grants summary judgment for Defendants on OAHHS's First Claim, alleging a violation of the Due Process Clause of the Fourteenth Amendment.

## B.  Plaintiff's Second Claim

Because the Court grants partial summary judgment for Defendants on OAHHS' First Claim, which is brought under federal law, the only matter that remains is OAHHS's Second Claim. In that claim, OAHHS alleges that HB 2362 violates the nondelegation principles found in the Oregon Constitution, which are different from the nondelegation principles contained in the U.S. Constitution. *See generally Corvallis Lodge No. 1411 v. Or. Liquor Contr. Comm'n*, 67 Or. App. 15 (1984). Under 28 U.S.C. § 1367(c), a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."

A district court's exercise of discretion in these circumstances "is informed by whether declining jurisdiction comports with the underlying objective of most sensibly accommodating the values of economy, convenience, fairness, and comity." *O'Connor v. Nevada*, 27

F.3d 357, 363 (9th Cir. 1994) (cleaned up). In deciding whether to exercise supplemental

jurisdiction over a state-law claim, a court must weigh "considerations of judicial economy,

convenience[,] and fairness to litigants; if these are not present a federal court should hesitate to

exercise jurisdiction over state claims." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726

(1966). "In the usual case in which federal-law claims are eliminated before trial, the balance of

factors will point toward declining to exercise jurisdiction over the remaining state law

claims." *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994) (cleaned up;

emphasis omitted).

      The Supreme Court also has cautioned that "[n]eedless decisions of state law should be

avoided both as a matter of comity and to promote justice between the parties, by procuring for

them a surer-footed reading of applicable law" and indicated in dicta that "if the federal claims

are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims

should be dismissed as well." *Gibbs*, 383 U.S. at 726. The Court recognizes that requiring

OAHHS to refile this case in state court will impose some additional cost and delay on OAHHS.

Even so, no factor weighs heavily in favor of retaining supplemental jurisdiction over OAHHS's

purely state-law claim. Further, because OAHHS asks this federal court to invalidate a state law

solely on state constitutional grounds, considerations of comity strongly favor the conclusion that

a federal court should decline jurisdiction. Accordingly, the Court declines to exercise

supplemental jurisdiction over OAHHS's state-law claim and dismisses that claim without

prejudice. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (explaining that when

the balance of factors "indicates that a case properly belongs in state court, . . . the federal court

should decline the exercise of jurisdiction by dismissing the case without prejudice"); *accord*

*Gini*, 40 F.3d at 1046.

**CONCLUSION**

The Court GRANTS Defendants' motion for summary judgment (ECF 28). The Court grants summary judgment for Defendants against Plaintiff's First Claim, which alleges a violation of due process under the Fourteenth Amendment of the U.S. Constitution. The Court declines to exercise supplemental jurisdiction over Plaintiff's Second Claim, which alleges a state-law violation of Oregon's nondelegation doctrine under the Oregon Constitution. The Court DENIES Plaintiff's cross-motion for summary judgment (ECF 31).

**IT IS SO ORDERED**.

DATED this 16th day of May, 2024.

 /s/ *Michael H. Simon*
Michael H. Simon
United States District Judge